## CLARK *v.* BEVER.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF IOWA.

. No. 116.   Argued December 15, 16, 1890. — Decided March 2, 1891.

In 1872, an Iowa railroad corporation, being indebted to a construction company in the sum of $70,000 which it was unable to pay in money, had a settlement with the latter, whereby the debt was paid in shares of the stock of the railroad company of the par value of $350,000. The stock was taken at 20 cents on the dollar, but was not, at the time, worth anything in the market. Greene, a member of the construction company, received 910 shares as his part. Subsequently, in 1876, the railroad and its appurtenances were sold under a decree foreclosing a mortgage given to secure the bonds of the railroad company. Clark, a holder of bonds issued by the railroad company in 1874, obtained judgment for the amount due him, upon which execution was issued and returned in 1880, no property. Greene having died, Clark brought suit against his admin- istrator in one of the circuit courts of Iowa, sitting in probate, to hold his estate liable for the difference between what was paid for the stock, and its face value, upon the ground that the stock of the corporation was a trust fund for creditors, and that as between creditors and stock- holders, the latter was bound to account for its face value. Upon the petition of Clark, the case was removed to and tried in the Circuit Court of the United States, where a verdict was returned by direction of the court for the defendant. *Held,*

(1) That as the proceeding involved a judicial determination of the lia- bility of Greene's estate for the claim in question, with parties before the court to contest all questions of law and fact, it was a " suit " within the meaning of the act of Congress providing for the removal of suits from the state courts. It is not competent for a State, by legislative enactment conferring upon its own courts exclusive jurisdiction of proceedings or suits involving the

settlement and distribution of the estates of deceased persons, to exclude the jurisdiction in such matters of the courts of the United States, where the constitutional requirement as to citizenship of the parties is met;

(2) That the value of the matter in dispute here is the amount of the claim the plaintiff seeks to establish, and that amount being in excess of $5000, without costs, this court has jurisdiction without reference to any inquiry as to what might be ultimately realized from Greene's estate, if the claim be established;

(3) That the estate of Greene is not liable for the face value of the stock by reason of the statute of Iowa providing that nothing therein contained " exempts the stockholders of any corporation from individual liability to the amount of the unpaid instalments on the stock owned by them or transferred by them for the purpose of defrauding creditors, and execution against the company may to that extent be levied upon such private property of any individual." Revision of Iowa, 1860, sec. 1172; Code of 1873, sec. 1082;

(4) That whether a stockholder in law or in fact, owed to the corporation any sum on the stock held by him, was left by the statute to be determined in each case, upon its own circumstances, and in accordance with the principles of general law touching the rights and liabilities of creditors and stockholders.

While the capital stock of a corporation, especially its unpaid subscriptions, is a trust fund *sub modo* for the benefit of its general creditors, a corporation — no statute forbidding — may in good faith sell or dispose of its stock to creditors in discharge of their debts.

The principle reaffirmed that when the interest of the public or of a stranger is to be affected by any transaction between the stockholders owning a corporation, and the corporation itself, such transaction is subject to rigid scrutiny, and if found to be infected with anything unfair towards such third person, calculated to injure him, or designed intentionally and inequitably to screen the stockholder from loss at the expense of the general creditor, it will be disregarded or annulled so far as it inequitably affects him. Therefore, when the interest of creditors requires, those holding shares in a corporation, purporting to be, but which are shown not to have been, paid for to the extent of their face value, should be held liable to pay for such shares unless it appears that they acquired the stock under circumstances that did not give creditors and other stockholders just ground for complaint.

The doctrine reaffirmed that the federal courts, sitting in any State, have equal and coördinate jurisdiction with the state court in determining questions of general law, although they will, in cases of doubt, lean to an agreement of views with the state court.

The case is stated in the opinion.

*Mr. P. Henry Smyth* for plaintiff in error.

*Mr. Charles A. Clark* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

In the year 1872, the Burlington, Cedar Rapids and Minnesota Railway Company — of which at the time the intestate George Greene was president, as well as a stockholder, and of which he continued to be president until February, 1875, — had a settlement with the Northwestern Construction Company, of which also Greene was a member, for work done in building a part of its road. This settlement showed the sum of $70,000 to be due the Construction Company. The railway company, being unable to pay this claim in money, delivered to the Construction Company thirty-five hundred shares of its stock, at twenty cents on the dollar, each share being for $100, and the same was accepted in full satisfaction of the debt. The stock, which was not worth anything in the market, was issued directly to the members of the Construction Company, the intestate Greene receiving 910 shares as his portion. No other payment than this twenty per cent was made for or on account of the stock. The good faith of the parties in making this arrangement is not impugned by allegation or proof. The Construction Company was reluctant to take the stock, and insisted upon payment in cash. What the original stockholders paid for their shares does not appear. Nor does the record show whether or not Greene exercised any of the privileges of a stockholder.

Prior to the above settlement a resolution was adopted February 7, 1871, by the executive committee of the railway company to the effect that, in the adjustment or liquidation of claims against the company, the treasurer be authorized to use its stock, if not less than twenty per cent of its par value could be realized for the purpose. At the time the stock was issued to Greene, the financial condition of the company was as follows : The bonded indebtedness of its main line was $5,400,000 ; its floating debts over $1,000,000 ; its net earnings in 1871 and 1872 and subsequently were not sufficient to meet the interest on its bonded debts; and in March, 1872,

when the settlement in question was made, it was without means to pay its floating debt or the interest on its bonded debt, except from net earnings and such money as could be realized from its stock and bonds and by borrowing.

The railway company continued to operate the road until May 19, 1875, on which day, in a suit brought in the United States Circuit Court for the District of Iowa to foreclose mortgages given by it to secure outstanding bonds, a receiver of its property was appointed. At this time the general condition of the company was this: Its bonded debt was $10,400,000, upon which no interest had been paid since November 1, 1873, and its floating debt amounted to $1,250,000, and it had no means with which to pay it. In the above suit a sale under a decree of foreclosure was made in July, 1876, when the railroad and all its property were purchased and have since been owned by the Burlington, Cedar Rapids and Northern Railway Company. After the appointment of the receiver, the Burlington, Cedar Rapids and Minnesota Railway Company ceased to do business or to exercise its franchises as a corporation.

It should be stated, in this connection, that Greene on the 10th of February, 1875, transferred the above 910 shares to John I. Blair, a gentleman of large fortune and financially responsible for the balance, if any, due on that stock. At the instance of the Western managers of the Burlington, Cedar Rapids and Minnesota Railway Company, Mr. Blair undertook to save it from bankruptcy. But, ascertaining that the company's overissue of bonds was so great and its liabilities so large, that it was necessary to commence foreclosure proceedings and to make application for the appointment of a receiver, he returned to Greene and others all the stock received by him.

Clark, the plaintiff below, a citizen of Ohio, being the holder of fifty gold bonds of one thousand dollars each of the Burlington, Cedar Rapids and Minnesota Railway Company, dated June 1, 1874, payable in the year 1914, and bearing interest at seven per cent per annum — which bonds were part of a series of two thousand, each for one thousand dol-

lars, secured by mortgage upon the company's net income, rolling stock and additions, and convertible at the option of the holder into capital stock — brought suit to recover the amount due thereon, and on the 4th of June, 1878, recovered judgment against the railroad company for the sum of $65,517, to bear interest from that date. We infer, though the record contains no distinct statement or proof on the subject, that the bonds became due and payable prior to this suit, on account of default in the payment of interest. Execution was issued upon the judgment and was returned August 10, 1880, no property found.

The present suit was commenced July 5, 1881, by Clark against the administrator of Greene, a citizen of Iowa, in the Circuit Court for Linn County, in that State. The petition, after setting out the foregoing judgment, the return of the execution thereon unsatisfied, and the ownership of the 910 shares of stock by Greene up to his death, and by his estate since, alleged " that of the value of said shares of stock owned by said decedent there has been paid only the sum of eighteen thousand two hundred dollars, or about twenty per centum of the full value of said stock, and there is still due upon said shares a balance of eighty per centum of their full value, amounting to the sum of seventy-two thousand and eight hundred dollars; that the said balance due upon said shares was a trust fund in the hands of said decedent for the payment of said judgment and is still a trust fund for that purpose in the hands of decedent's administrator; that the defendant herein is the administrator of the estate of said George Greene, deceased, duly appointed and qualified ; that said decedent in his lifetime failed and neglected to pay or cause to be paid the said judgment · or any part thereof, and this defendant has failed and neglected to pay or cause to be paid the same or any part thereof, and the said judgment is still due and wholly unpaid." The prayer of the petition was for a judgment against the defendant as administrator for the whole amount of the plaintiff's claim, with interest and costs, and that it be allowed by the court as a just claim against Greene's estate.

The case was subsequently removed upon the petition of Clark to the Circuit Court of the United States for the District of Iowa, and thereafter by consent was transferred to the Eastern Division of the Southern District of that State.

The defendant, besides denying each allegation of the plaintiff's claim and petition, pleads, in bar of the action, the statute of limitations of Iowa, and, also, a certain settlement and compromise between the plaintiff and the railway company. To this answer a replication was filed by the plaintiff.

After the evidence was concluded the plaintiff asked several instructions based upon the general ground that the stock used in discharging the debt of the Construction Company was a trust fund for the benefit of creditors, and that, without reference to the necessities of the railroad company or the good faith of the transaction, Greene was accountable to the creditors of the latter corporation for the par value of the stock issued to him under the settlement or compromise of 1872, whatever may have been its market value at the time he got it or at the time this action was commenced.

The court below refused to so instruct the jury, and held, as matter of law, that upon the evidence the intestate Greene, by taking the 910 shares of stock upon which the twenty per cent was paid, did not become liable to pay anything further on account thereof to creditors of the railway company; and, pursuant to its direction, the jury returned a verdict for the defendant. *Clark* v. *Bever, Adm'r*, 31 Fed. Rep. 670.

The questions to be first considered relate to the jurisdiction of the court below and of this court.

This proceeding was commenced in one of the Circuit Courts of Iowa, having general original jurisdiction in all civil actions and special proceedings, and original exclusive jurisdiction, in the respective counties of the State, among other things, "of the settlement of the estates of deceased persons." Of the filing of a claim against the estate of a deceased person, the executor or administrator is entitled to notice, to be served "in the manner required for commencing ordinary proceedings," unless the claim be expressly admitted in writing with the approbation of the court, and when not so admitted "the

court may hear and allow the same, or may submit it to a jury." On such hearing, unless otherwise declared, the court is governed by the provisions of law applicable to an ordinary proceeding. When a claim is allowed, it is "placed in the catalogue of established claims, but shall not be a lien." Code of Iowa, 1873, secs. 161, 2312, 2370, 2408, 2409, 2410, 2411, 2416. No other court of the State, except a Circuit Court, has jurisdiction to allow or disallow a claim against the estate of a deceased person. *Tillman* v. *Bowman*, 68 Iowa, 450; *Shropshire* v. *Long*, 68 Iowa, 537. While an order allowing such a claim is not an ordinary judgment upon which an execution may issue, it is an "adjudication" establishing that claim as one to be paid by the executor or administrator so far as the estate in his hands is sufficient. *Foteaux* v. *Lepage*, 6 Iowa, 123; *Voorhees* v. *Eubank*, 6 Iowa, 274; *Little* v. *Sinnett*, 7 Iowa, 324; *Smith* v. *Shawhan*, 37 Iowa, 533; *Dessaint* v. *Foster, Adm'r*, 72 Iowa, 639, 640. It is suggested that the claim in suit here is a mere incident to the marshalling and distribution of the estate of Greene; that such estate can only be administered and distributed by the state court in accordance with the laws of the State; and that the Circuit Court of the United States was without jurisdiction to determine whether it was or not a valid claim against that estate. This position is wholly untenable. As the proceeding involved a judicial determination as to the liability of Greene's estate for the amount of Clark's claim, with parties before the court to contest all the questions of law and fact, it was clearly a "suit," within the meaning of the act of Congress providing, for the removal of suits to the Circuit Courts of the United States. The removal in this case was, therefore, proper, unless it be competent for a State, by legislative enactment conferring upon its own courts exclusive jurisdiction of all proceedings or suits involving the settlement and distribution of the estates of deceased persons, to exclude the jurisdiction of the courts of the United States even in cases where the constitutional requirement as to citizenship is met. But this court has decided, upon full consideration, that no such result can be constitutionally effected by state legislation. The case of

*Hess* v. *Reynolds*, 113 U. S. 73, 77, involved a disputed claim originally filed in a probate court of Michigan, carried by appeal to a Circuit Court of the same State, and subsequently removed to the Circuit Court of the United States for the District of Michigan. Substantially the same question of jurisdiction was raised in that case that is here presented. This court said: " It may be convenient that all debts to be paid out of the assets of a deceased man's estate, shall be established in the court to which the law of the domicil has confided the general administration of these assets. And the courts of the United States will pay respect to this principle, in the execution of the process enforcing their judgments out of these assets, so far as the demands of justice require. But neither the principle of convenience, nor the statutes of a State, can deprive them of jurisdiction to hear and determine a controversy between citizens of different States, when such a controversy is distinctly presented, because the judgment may affect the administration or distribution in another forum of the assets of the decedent's estate. The controverted question of debt or no debt is one which, if the representative of the decedent is a citizen of a State different from that of the other party, the party properly situated has a right, given by the Constitution of the United States, to have tried originally, or by removal, in a court of the United States, which cannot be defeated by state statutes enacted for the more convenient settlement of estates of decedents." See also *Payne* v. *Hook*, 7 Wall. 425; *Boom Company* v. *Patterson*, 98 U. S. 403; *Ellis* v. *Davis*, 109 U. S. 485; *Delaware County* v. *Diebold Safe Co.*, 133 U. S. 473, 487; *Upshur County* v. *Rich*, 135 U. S. 467, 477.

It is next contended that, under the statutes of Iowa governing the settlement of the estates of deceased persons, the plaintiff in error has only an interest in the " fund " arising from Greene's estate; and as it does not appear, affirmatively, that such interest exceeds, or can exceed, in value the sum of five thousand dollars, this court is without jurisdiction and the writ of error should be dismissed. This contention must be overruled. The plaintiff seeks a judgment against the

estate of Greene for the sum of $65,523.20, with interest. The defendant disputes the whole of that claim. The sum sued for — the entire claim having been rejected — is the value of the matter in dispute here; and our jurisdiction to determine that dispute cannot depend upon an inquiry as to whether the estate of Greene, when fully distributed, may or may not yield to the plaintiff, if successful here, something in excess of five thousand dollars. Such an inquiry is as inadmissible, on this writ of error, as it would be if the judgment had established the claim of the plaintiff against Greene's administrator for the full amount, and a writ of error had been prosecuted by him to reverse that judgment. The case is different from *Miller* v. *Clark*, 138 U. S. 223, decided at the present term, where the appeal was dismissed, because it appeared, affirmatively, that the appellant, who was the plaintiff below, did not claim, and could not possibly recover, *for himself*, a sum in excess of $5000.

We come now to consider the principal questions in the case. They relate to the liability of the defendant for the difference between the face value of the stock issued to Greene in 1872 and the value at which it was rated in the settlement of that year with the Burlington, Cedar Rapids and Minnesota Railway Company. The general proposition advanced by the plaintiff is, that it was not competent for the railway company to issue to Greene and his associates in discharge of its debt to them, amounting to $70,000, thirty-five hundred shares of stock of the par value of $350,000, although the settlement upon that basis may have been demanded by the best interests of the company, and was made in good faith without intention to harm the corporation or to defraud its creditors, existing or subsequent, and although the stock at the time "was not worth anything in the market;" and that Greene took the 910 shares issued to him for twenty per cent of its face value, subject to the implied condition that he should be liable for any unpaid debts of the corporation to the extent of the difference between the face value of the stock and the amount at which it was taken by him. It is not contended that such liability arises from the relations Greene held

to the two companies making the settlement of 1872, but from the obligations the law imposed for the benefit of creditors both upon the corporation issuing the stock and its stockholders. Of course, under this view, every one having claims against the railway company — even laborers and employés — who could get nothing except stock in payment of their demands, became bound, by accepting stock at its market value in payment, to account to unsatisfied judgment creditors for its full face value, although, at the time it was sought to make them liable, the corporation had ceased to exist, or its stock had remained, as it was when taken, absolutely worthless. Such the plaintiff, in effect, insists is the law of Iowa.

The statutory provisions that are supposed by the plaintiff to sustain his position, which were in force when the stock in question was issued, are found in Title X, chapter 52 of the Revision of the Statutes of Iowa of 1860, relating to the creation of corporations for the transaction of any lawful business, including the establishment of ferries, the construction of canals, railways, bridges or other works of internal improvement. (Sec. 1150.) Among the powers which such corporations may exercise are "to make contracts, acquire and transfer property, possessing the same powers in such respects as private individuals now enjoy," and "to establish by-laws, and make all rules and regulations deemed expedient for the management of their affairs in accordance with law and not incompatible with an honest purpose." (Sec. 1151.) Articles of incorporation were required to be recorded in the office of the recorder and Secretary of State. (Sec. 1152.) A notice of the incorporation must be published, containing the name of the corporation and its principal place of transacting business ; the general nature of such business ; the amount of capital and stock authorized and the terms and the conditions on which it is to be paid in ; the time of the commencement and termination of the corporation ; by what officers or persons the affairs of the corporation are to be conducted, and the times at which they will be elected ; the highest amount of indebtedness or liability to which the corporation is at any time to subject itself ; and whether private property is to be

exempt from corporate debts. (Secs. 1154, 1155.) A failure to comply with the above and other provisions in relation to organization and publicity, rendered the individual property of all the stockholders liable for the corporate debts, except that stockholders in railway companies were made liable only for the amount of stock held by them in such companies. (Secs. 1166, 1338.) Intentional fraud in failing to comply substantially with the articles of incorporation, or in deceiving the public or individuals in relation to their means or their liabilities, subjected those guilty thereof to fine and imprisonment, or both, at the discretion of the court. (Sec. 1163.) The practice of fraud in the manner mentioned caused a forfeiture of all the privileges conferred, and the courts could proceed, upon information, to wind up the business of the corporation. (Sec. 1167.) A copy of the by-laws of the corporation and a statement of the amount of capital stock subscribed, the amount actually paid in, and the amount of the indebtedness in a general way, was required to be kept posted up in the principal places of business, subject to public inspection, such statement to be corrected as often as any material change took place in relation to any part of the subject matter of the statement. (Secs. 1161, 1162.)

The provisions upon which the plaintiff particularly relies are the following:

"SEC. 1169. The transfer of shares is not valid except as between the parties thereto until it is regularly entered on the books of the company so far as to show the name of the persons by and to whom transferred, the number or other designation of the shares, and the date of the transfer; but such transfer shall not in any way exempt the person or persons making such transfer from any liability or liabilities of said corporation which were created prior to such transfer."

"SEC. 1172. Nothing herein contained exempts the stockholders of any corporation from individual liability to the amount of the unpaid instalments on the stock owned by them or transferred by them for the purpose of defrauding creditors, and execution against the company may to that extent be levied upon such private property of any individual.

"Sec. 1173. In none of the cases contemplated in this chapter can the private property of the stockholders be levied upon for the payment of corporate debts while corporate property can be found with which to satisfy the same, but it will be sufficient proof that no property can be found if an execution has issued on a judgment against the corporation and a demand thereon made of some one of the last acting officers of the body for property on which to levy, and if he neglects to point out any such property.

"Sec. 1174. The defendant in any stage of a cause may point out corporate property subject to levy, and upon his satisfying the court of the existence of such property by affidavit or otherwise the cause may be continued or execution against him stayed until the property can be levied upon and sold, and the court may subsequently render judgment and order execution for any balance which there may be after disposing of the corporate property according to the stage of the cause; but if a demand of property has been made, as contemplated in the preceding section, the costs of such proceedings shall in any event be paid by the company or by the defendant."

These provisions are substantially preserved in the Iowa Code of 1873. §§ 1058, 1059, 1062, 1063, 1068, 1071, 1078, 1082, 1083, 1084.

The argument in behalf of the plaintiff assumes that, consistently with these statutory provisions, no one can, under any circumstances whatever, become the owner of the stock of an Iowa corporation, except subject to the condition that, where property of the corporation cannot be found, the private property of the stockholder may be seized under execution in favor of a judgment creditor to the extent of the difference between what he actually paid for the stock, whether in money or in property, and its face value. And it is further insisted that, independently of the statute, such is the doctrine of general law relating to subscriptions to the stock of corporations, as announced by this court in several cases. We are of opinion that neither of these positions can be maintained.

The local statute undoubtedly proceeds upon the ground that unpaid instalments of stock subscribed constitute — no other rule being prescribed by legislative enactment — a trust fund for the benefit of creditors. But it does not declare that a corporation is without power, under any circumstances whatever, to dispose of its stock at less than par, or that stock purporting to be full paid shall, in all cases, and without reference to the circumstances under which it was acquired, be deemed unpaid to the extent that the amount given for it by the owner, whether in money or in property, was less than its face value. On the contrary, the statute itself imposes no express restriction upon the disposition by a corporation of its stock except such as is imposed upon individuals, and prescribes no rule in respect to the liability of a stockholder to creditors except that when corporate property cannot be found to pay a judgment creditor, his private property may be seized under the execution to the extent of any unpaid instalments on the stock owned by him. Whether any such indebtedness really exists upon the part of a particular stockholder, and whether he in law or in fact owes any sum on the stock held by him, was left by the statute to be determined in each case, upon its own circumstances, and in accordance with the principles of general law touching the rights and liabilities of creditors and stockholders. If the legislature had intended that the acquisition of stock at less than its face value should be conclusive evidence in every case that the stock, as between creditors and stockholders, is "unpaid," it would have been easy to so declare, as has been done in some of the States. If such a rule be demanded by considerations of public policy, the remedy is with the legislative department of the government creating the corporation. A rule so explicit and unbending could be enforced without injustice to any one, for all would have notice from the statute of the will of the legislature. It is not for the courts by mere interpretation of a statute, not justified by its language, to accomplish objects that are within the exclusive province of legislation. If, when receiving the 910 shares of stock in payment of his portion of the claim of $70,000 against the railroad company, Greene had supposed

that he would thereby become liable to account to creditors for its full face value without regard to the real value of the stock, and whether the corporation subsequently became bankrupt or not, he certainly would not have taken it. It is equally certain that no such result was contemplated by the other party to the settlement. It is also certain that the acceptance by the members of the Construction Company of worthless stock in full discharge of its claim was a benefit to both the existing creditors and the holders of stock of the railroad company not paid in full: to creditors, because it diminished the number of that class who would be entitled to share in the assets of the company; to stockholders so situated, because it lessened the number of creditors, to whom, in any contingency, they would be liable in their private property for the debts of the corporation. Here was a corporation which, at the time of the settlement of 1872 with Greene and his associates, was unable from its net earnings to pay the interest on its bonded debt. It could not pay even its floating debt without borrowing money or making sale of stock. But its stock could not be sold for money. It had no market value, and the company could not get rid of the debt due for construction except by borrowing money or selling stock. If it had borrowed money and secured its payment by mortgage upon its real property or income, it would thereby have added to the burdens of creditors and original stockholders. So far as the record discloses, it did in good faith what was best for all then concerned in the railroad company, namely, paid off a large claim for construction with worthless stock, those to whom it was issued taking their chances that it might at a future time acquire some value, but with the certainty that if the railroad company became bankrupt and ceased to do business all of its assets would be appropriated by creditors, leaving nothing whatever to stockholders.

Do the decisions of this court require us to hold, in such a case, that a creditor taking stock in payment of his claim is bound to other creditors for the face value of the stock? The plaintiff contends that our decisions are to that effect. Let us see. In *Sawyer* v. *Hoag*, 17 Wall. 610, 620, it was held

that the capital stock of a corporation, especially its unpaid subscriptions, is a trust fund *sub modo* for the benefit of its general creditors. And this principle was reaffirmed in *Upton, Assignee,* v. *Tribilcock,* 91 U. S. 45; *Sanger* v. *Upton, Assignee,* 91 U. S. 56; *Webster* v. *Upton, Assignee,* 91 U. S. 65; *Pullman* v. *Upton,* 96 U. S. 328; *Chubb* v. *Upton,* 95 U. S. 665; *Morgan County* v. *Allen,* 103 U. S. 498; *Scovill* v. *Thayer,* 105 U. S. 143; *Hawkins* v. *Glenn,* 131 U. S. 319, 335; and *Richardson* v. *Green,* 133 U. S. 30, 45. There is no dispute here as to the soundness of this general principle. The dispute is as to its application to a case like the present one. We can be aided in solving this inquiry by ascertaining the character of the particular cases in which it has been applied by this court. In *Sawyer* v. *Hoag,* a subscription of $5000 to the stock of an insurance company for which the subscriber paid in full, but received in return the check of the corporation for $4250 under an agreement that the debt for the stock should be extinguished, and the amount of the check should be treated simply as a loan of money to the stockholder, was held to be a mere device to evade the rule that unpaid subscriptions of stock constitute a trust fund for the benefit of the creditors of the corporation; consequently, that the stock there in question was to be regarded, as between the corporation and creditors, to be unpaid to the extent of the amount received back from the corporation under the pretence of a loan. In *Upton, Assignee,* v. *Tribilcock,* an actual subscriber to the stock of an insurance company upon which he agreed to pay 20 per cent, was held responsible for the balance, and could not escape liability therefor because of representations by the agent, at the time of the subscription, that he would be only responsible for that amount, or by proving a subsequent arrangement with the company cancelling the subscription, and accepting, as in full payment, his note for the 20 per cent agreed to be paid. *Sanger* v. *Upton, Assignee,* was another case of the actual subscription of stock upon which the subscriber was held to pay the full sum subscribed. In *Webster* v. *Upton, Assignee,* a person holding certificates of stock by transfer from the original subscriber, and standing

upon the books of the corporation as a stockholder, was held liable for the balance due upon the stock, without proof of an " express" promise upon his part to pay. In *Chubb* v. *Upton*, the decision was that one receiving a certificate of stock for a certain number of shares, at a given sum per share, thereby became liable to pay the amount thereof when called upon by the corporation or its assignee in bankruptcy; and in *Pullman* v. *Upton*, that a transferee of stock who caused the transfer to be made to himself as collateral security for a debt of the transferer, was liable for the balance due on such stock. The doctrine of the latter case was approved in *Hawkins* v. *Glenn*. In *County of Morgan* v. *Allen*, it was decided that the subscription by a county to the capital stock of a railroad company, together with the bonds given therefor, constituted with other property of the company a trust fund, to which all its creditors could rightfully look for satisfaction of their claims; and that by no device or combination, to which particular creditors were parties, could it withdraw its bonds from that fund, and thereby avoid liability to the general creditors of the company. In *Scovill* v. *Thayer*, it was declared, among other things, that a contract between a corporation and its stockholders, that they should never be called upon to pay any other assessment than that paid at the outset, while good as between the corporation and the stockholders, was a fraud in law upon creditors, which they could have set aside whenever their rights intervened, and their claims were unsatisfied. In *Richardson* v. *Green*, it was held that the issuing by a corporation of bonus stock was in violation of a statute of the State declaring it to be unlawful to issue certificates of stock until the shares were fully paid, and that one exercising the privileges and powers of a stockholder in a corporation was not exempt from the liabilities attaching to a *bona fide* stockholder who took shares purporting to be, but which in fact were not, fully paid.

This detailed statement of the above cases has been made because of the confident assertion that they rest upon doctrines necessarily requiring the reversal of the judgment. We do not concur in this view. In all of these cases, except one,

there was an actual subscription of a given amount. They were cases of promises to pay the company the amount subscribed, not of sales by it. According to those cases, a stockholder, becoming such by formal subscription or by transfer upon the books of the corporation, cannot be discharged to the injury of creditors by any agreement, arrangement or device to which creditors do not give their assent, and by which the stockholder is to pay less than the amount due upon such stock; this, upon the ground stated in *Webster* v. *Upton, Assignee*, that "neither the stockholders nor their agents, the directors, can rightfully withhold any portion of the stock from the reach of those who have lawful claims against the company," and that "the stock thus held in trust is the whole stock, not merely that percentage of it which has been called in and paid." The present case presents features that are not to be found in the others. It is not the case of an ordinary subscription of stock in a given amount. Nor is it, strictly, one of an ordinary purchase of stock for purposes of investment. It is the case of a creditor of an insolvent railroad corporation which, in consequence of its inability to pay creditors in money, was threatened with bankruptcy, and which refused or was unable to pay except in stock that was without market value. To say that a public corporation, charged with public duties, may not relieve itself from embarrassment by paying its debt in stock at its real value — there being no statute forbidding such a transaction — without subjecting the creditor, surrendering his debt, to the liability attaching to stockholders who have agreed, expressly or impliedly, to pay the face value of stock subscribed by them, is, in effect, to compel them either to suspend operations the moment they become unable to pay their current debts, or to borrow money secured by mortgage upon the corporate property. We do not think the statute of Iowa can be properly construed to cause such a result in respect to corporations organized under its laws.

We must not be understood as modifying in any respect the principles laid down in the cases above cited, nor the salutary rule laid down in *Sawyer* v. *Hoag*, that when the interest of

the public or of strangers is to be affected by any transaction between the stockholders owning the corporation and the corporation itself, "such transaction should be subject to a rigid scrutiny, and if found to be infected with anything unfair toward such third person calculated to injure him, or designed intentionally and inequitably to screen the stockholder from loss at the expense of the general creditor, it should be disregarded or annulled so far as it may inequitably affect him." These principles were reaffirmed in *Richardson* v. *Green*, and should not be relaxed in any case in which they may be applied consistently with justice. So, when the interest of creditors require, those who hold shares of stock in a corporation, purporting to be, but which are shown not to have been, paid for to the extent of their face value, should be held liable to pay for such shares in full, unless it appears that they acquired the stock under circumstances that did not give creditors and other stockholders just ground for complaint. As said by this court in *Peters* v. *Bain*, 133 U. S. 670, 691, " unpaid subscriptions to stocks are assets, and have frequently been treated by courts of equity as if impressed with a trust *sub modo*, in the sense that neither the stockholders nor the corporation can misappropriate such subscriptions so far as creditors are concerned." See also *Graham* v. *Railroad Co.*, 102 U. S. 148, 161; *Wabash, St. Louis &c. Railway* v. *Ham*, 114 U. S. 587, 594; *Fogg* v. *Blair*, 133 U. S. 534, 541.

The general grounds upon which we have proceeded are supported by *New Albany* v. *Burke*, 11 Wall. 96, 103, *et seq.* In that case, a judgment creditor of an insolvent railroad corporation sought to hold the city of New Albany liable for the balance alleged to be due by it on a subscription to the capital stock of that corporation. Under an ordinance of the city, a subscription of $400,000, payable in city bonds, was made by it to the stock of the corporation, the railroad company agreeing that not more than $250,000 of the bonds should be called for until the road was completed to a certain place. Pursuant to the subscription, the city delivered to the company $200,000 of its bonds, payable to bearer. In consequence of its inability to obtain money on them, the company was unable

to carry on the works, and abandoned the enterprise, after having pledged nearly all of the bonds received by it for money borrowed to prosecute it. Under those circumstances the company proposed to the city that if it would provide means for the payment of the sums borrowed, the bonds so pledged should be returned to the city and cancelled. If the bonds had been sold by the pledgees they would not have brought more than sufficient to pay the sums borrowed. The city accepted the proposition made to it upon the condition to which the railroad company acceded, that the latter would cancel the city's subscription and consent to the repeal of all ordinances relating thereto. The agreement was carried into effect, the city paying the sums for which the bonds were pledged, amounting to more than $36,000. All the bonds, except seven that had been sold, were returned to the city and cancelled, as was also the subscription of stock. One of the contentions of the judgment creditor was that this arrangement or compromise was fraudulent in law, because the capital stock of the corporation was a trust fund irrevocably pledged for the benefit of creditors, and that the corporation could not, when insolvent, give away its assets, or release its debtors without payment, or do any other act prejudicial to creditors. This court said : " There was no restriction in the contract upon the power of disposition, and none at law, or in equity, unless it be that the company could not part with the bonds in fraud of its stockholders or its creditors. And it had the right, which all other debtors had at the time, to make preferences among its creditors — to pay one rather than another. It is not to be disputed that, situated as the company was at the time when the contract of August and September, 1857, was made, with the debt of $36,000 pressing upon it, and with no other means of relief, it might have sold the entire lot of two hundred and forty-three bonds which it held, or was entitled to call for, at the best price that could have been obtained, and might have applied the entire proceeds, had they been needed, to pay that single debt. Of this, neither the stockholders nor the other creditors could have complained. . . . Time has revealed that the bonds were

worth more than they could have been sold for, but we are to look at the circumstances as they were when the transaction took place, in considering what was its nature and whether it was legal. . . . Certainly it [the compromise] did not place the company in any worse position than it must have held had it not been made. . . . Besides, as we have seen, the arrangement assailed by the complainants was not a modification of the subscription previously made, or a bonus given for a release. It was rather a purchase of the city debt. We think it was not beyond the power of the contracting parties." Again, after observing that the arrangement made was binding upon the railroad company, through which, as well as against which, the judgment creditors claimed, the court said : " No doubt the subscribed capital stock of a corporation is a fund held by it in trust for its creditors, as is also all its other property, and had the railroad company released, without equivalent consideration, or given it away, its action would have been fraudulent, and might have been set aside by a court of equity. But certainly it was in the power of the directors to apply the subscription on bonds taken in payment to the extinguishment of debts, and, if thus applied in good faith, all being obtained for it that it was worth, no one has been wronged. It is, therefore, a question of fact to be determined by the evidence, whether the bonds and the balance of the city's subscription were thus applied. . . . We may add, the evidence is convincing that the contract between the city and the company was made in the utmost good faith, with no intention to wrong the creditors of the latter; that it was at the time considered advantageous to the company, and it is not proved that all was not paid for the bonds issued and to be issued that they could have been sold for in the market." These principles have not been modified by any decision of this court, and they fully sustain the judgment in this case. And there is some support for the judgment in *Gelpcke* v. *Blake*, 19 Iowa, 263, 268, decided in 1865, in which a creditor of a railroad corporation sought to hold a stockholder liable on his subscription, notwithstanding his release by it. The court said : " Again, a release is a contract, and the articles of

incorporation give to this company all the powers described in section 674 of the Code of 1851. The sixth clause of that section invests the company with power to make contracts, acquire and transfer property, possessing the same powers in such respects as private individuals now enjoy. There was no lack of power, therefore, in this company, nor do we think there would have been in the board of directors, to rescind the contract with or without the consent of the stockholders or others, when it was done in good faith, and under the peculiar and equitable circumstances of the case." The clause in the Code of 1851, above referred to, was reproduced in the Revision of 1860, § 1151, and in the Code of 1873, § 1059.

It is, however, contended that the judgment cannot be sustained without disregarding later decisions of the Supreme Court of Iowa, which, it is insisted, rest upon the statute of that State, and are binding upon this court. Reliance is particularly placed by the plaintiff upon *Jackson* v. *Traer*, 64 Iowa, 469. All the cases in that learned court to which attention has been called were determined after Greene acquired the stock in question, and all, with one exception, after this litigation was commenced. The recognition in the Iowa statute of the right of creditors of corporations to look to unpaid instalments of stock subscriptions to obtain satisfaction of their demands did not confer a new right, but is a recognition of a right existing before the statute in virtue of the relations between a corporation and its creditors and stockholders. The new right given to the creditor by the statute is to have his execution, when corporate property cannot be found, levied upon the private property of the stockholder who is indebted on his subscription of stock; it being declared, out of abundant caution, that nothing in the statute "exempts" stockholders from individual liability to the amount of their unpaid instalments of stock. The decisions of the state court are not, therefore, to be regarded as resting upon the local statute, but only as expressing the views of that tribunal in respect to the same principles of general law announced by this court, after the fullest consideration, in the numerous cases to which we have adverted. The leading case in the state court upon this

subject is *Jackson* v. *Traer*, above cited. It involved the liability of Greene's estate to another judgment creditor of the railroad company for the difference between the face value of his stock and the price at which it was received in payment of his claim. Upon the first hearing in the Supreme Court of the State, all its members except one held that the stock should be treated as fully paid. Upon a rehearing, at the October term, 1884 — some time after this action was brought and had been removed into the court below — three of the judges held that Greene's estate was bound to account to creditors for eighty per cent of the face value of the stock received by him. Chief Justice Rothrock and Judge Seevers dissented. The two cases since *Jackson* v. *Traer* — we allude to *Boulton Carbon Co.* v. *Mills*, 78 Iowa, 460, and *Tama Water Power Co.* v. *Hopkins*, 79 Iowa, 653 — do not rest upon any ground that is inconsistent with the views we have expressed. We cannot, consistently with our deliberate judgment upon this question of general law, accept the decision in *Jackson* v. *Traer* as controlling the determination of the present case. Upon questions of that character the federal courts administering justice in Iowa have equal and coördinate jurisdiction with the courts of that State, although they will lean " towards an agreement of views with the state court if the question seems to them balanced with doubt." *Railroad Co.* v. *Lockwood,* 17 Wall. 357, 367; *Burgess* v. *Seligman,* 107 U. S. 20; *Pana* v. *Bowler,* 107 U. S. 529; *Hough* v. *Railway Co.,* 100 U. S. 213, 226; *Railroad Co.* v. *National Bank,* 102 U. S. 14, 30, 31; *Myrick* v. *Michigan Central Railroad,* 107 U. S. 102, 109; *Carroll County* v. *Smith,* 111 U. S. 556; *Bolles* v. *Brimfield,* 120 U. S. 759. The judgment below, in our opinion, is in accordance with the law as it was adjudged to be when Greene received the stock in question and surrendered his claim upon the railroad company, and with the law as this court has since that time frequently declared it to be; and our duty is to so declare in the case before us. *Judgment affirmed.*

Mr. Justice Brown, not having been a member of the court when this case was argued, did not participate in its decision.