DETROIT–KENTUCKY COAL CO. et al. v. BICKETT COAL & COKE CO.

(Circuit Court of Appeals, Sixth Circuit. July 1, 1918.)

No. 3129.

1. CORPORATIONS ⬤⟶99(2)—ISSUE OF STOCK—CONSIDERATION.

   Under Const. Ky. § 193, and Ky. St. §§ 568, 569, corporate stock cannot be issued in return for labor or services, unless the market value of the services is equal to the par value of the stock.

2. CORPORATIONS ⬤⟶99(2)—ISSUANCE OF STOCK—CONSIDERATION.

   Where a contract with a corporation was invalid, under Const. Ky. § 193, and Ky. St. §§ 568, 569, by reason of an agreement to issue stock without receiving its par value, the validity of the contract is not affected by a rejected offer to pay an additional amount pending litigation.

3. CONTRACTS ⬤⟶137(2)—SEPARABLE PROVISIONS.

   In a contract of a coal mining company with a sales company to issue stock to president of latter and give sales company exclusive rights to sell coal, sales company to make certain advances, the part of the contract giving the exclusive agency was not separable, so as to be enforced, where agreement to issue stock was invalid; no offer being made to cancel the stock provision and yet make the advances, which were necessary for operation of the mine.

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Suit by the Bickett Coal & Coke Company against the Detroit-Kentucky Coal Company and others, for specific performance of contracts and to enjoin violation of such contracts. From an order granting a preliminary injunction, defendants appeal. Reversed.

Nelson B. Cramer, of Cincinnati, Ohio, and J. J. Moore, of Pikeville, Ky., for appellants.

Henry J. & Charles Aaron and W. H. Holly, all of Chicago, Ill., and Humphrey, Middleton & Humphrey, of Louisville, Ky., for appellee.

Before KNAPPEN, MACK, and DENISON, Circuit Judges.

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

KNAPPEN, *Circuit Judge.* Appeal from an order granting preliminary injunction.

The Detroit-Kentucky Coal Company (hereinafter called the Detroit Company) is a coal mining corporation organized under the laws of Kentucky, with a capital stock of $50,000. In February, 1917, it held long-time mining leases on about 1,000 acres of bituminous coal lands in Pike county, Ky., upon a royalty of 6¼ cents per ton. The Detroit Company had begun development, apparently to the extent of constructing tipple and power house, installing machinery, beginning construction of switch siding to the Baltimore & Ohio Railroad, and opening up two seams of coal. The mines seem to be in a good mining district, favorably located with respect to railroad and switching facilities, freight rates, and car service, and the character and quality of coal producible from the mines appear to be good. In the then state of the market the royalties were reasonable. The company was, however, without means for completing development and for marketing its coal. It had given its president, George, one-half its stock as consideration for the mining leases, the cash outlay for which (made by George) seems to have been but a few hundred dollars. While the company had sold some of its remaining stock, and contracted for the sale of more, it had realized but a few thousand dollars therefrom, and was already in debt at least $8,000 on account of the development thus far had.

In this juncture it applied to Bryan G. Tighe, vice president of the Bickett Coal & Coke Company (an Illinois corporation engaged at Chicago in buying and selling coal), for a loan of $15,000, to be secured by mortgage upon all of its assets, apparently including capital stock held in the company's treasury, as well as certain private holdings of stock—the Bickett Company to be given the exclusive right for a certain period to sell the Detroit Company's output. This application fell through, partly at least from the fact that it later appeared that the Detroit Company's indebtedness was larger than at first represented, and that further development, including the building of houses for miners, required considerable additional sums of money. The result was that on April 10, 1917, the Detroit Company, through its president and vice president (its secretary attesting), made two contracts with the Bickett Company, the one called a finance contract, and the other a sales contract.

By the terms of the finance contract the Bickett Company agreed to immediately advance to the Detroit Company $8,000 to pay certain indebtedness due the railroad and other creditors, to advance within 60 days a further sum of $7,000 for operating expenses, and thereafter to make such advances as should be necessary for the proper development from time to time of the mines of the Detroit Company—all sums advanced to be repaid from the profits of the Detroit Company as rapidly as permissible. The Detroit Company, in turn, agreed to increase its capital stock to $100,000, to give Tighe 51 per cent. thereof, as fully paid and nonassessable, for his services in procuring the finance and sales contracts referred to, to cause the number of its directors to be increased from three to five (electing Tighe and Bickett—appellee's president—as directors), and to hold the necessary meetings of stockholders and directors to accomplish the changes mentioned. It was also

agreed that George, the then president of the Detroit Company, should be elected its general manager, his management, however, to be under the supervision and direction of the president of the Bickett Company, which had the right to employ, at the expense of the Detroit Company, a mining superintendent in complete charge of all matters pertaining to the development of the Detroit Company's property, including the mining, screening, and shipping of coal.

By the terms of the sales contract the Bickett Company was given the exclusive right to sell the entire output of the Detroit Company's mines until April 1, 1920, paying therefor until April 1, 1918, $1.50 per ton, the prices for the two later years to be fixed by agreement previous to the beginning of the respective years, and in case of failure to agree upon prices the Bickett Company to receive a commission of ten per cent. on all sales made either by it or the Detroit Company (the Bickett Company agreeing only to use its best efforts to sell), the Detroit Company in such case having the right to fix prices.

These two contracts were made without previous authority from the Detroit Company's directors or stockholders, aside from its president (George), its secretary (Sohn), and its vice president (Nerny), who seem to have represented a majority of the outstanding stock. The contracts were ratified at a subsequent directors' meeting; a stockholders' meeting was called for the purpose, but failed to approve the contracts. The company's attorney, in fact, advised the stockholders that the contracts were illegal and void.

The Bickett Company, which had meanwhile advanced the entire $15,000 in the two installments specifically called for by the finance contract, filed its bill for specific enforcement of both contracts, and a temporary restraining order was issued, which later was continued until the hearing on motion for preliminary injunction; defendant being later permitted to sell its output and collect all moneys therefrom, expending it only for operation and development.

Defendant answered the injunction bill, praying its dismissal and the cancellation of both contracts, for the reasons, among others, that the contract for the issue of stock to Tighe was ultra vires and void under the Kentucky Constitution, its execution subjecting the corporation to loss of its franchise by virtue of the Kentucky Statutes; that the sales contract was unconscionable, in that the agreed price for coal was far below its then market value; and that the entire contract was unenforceable because of the fact that the consideration therefor had wholly failed, in that the Bickett Company was not obligated to furnish further moneys, except upon compliance with the stock agreements, and without such moneys being furnished defendant could not operate its business.

Pending hearing upon motion for preliminary injunction, the defendant Ford, who was vice president of the Matthew Addy Company, a coal-selling agency at Cincinnati, purchased stock in the Detroit Company. An arrangement was made by which the Matthew Addy Company was to make certain necessary advances for development and operation, and to have the exclusive contract for selling the Detroit Company's output. Thereupon the Bickett Company filed an amended bill, asserting such arrangement, actual or contemplated, and offering

that it or Tighe would pay the Detroit Company $15,000 for the 51 per cent. of the capital stock which was to go to Tighe, and to increase the price to be paid for the coal to $1.75 per ton. This amended bill was filed with the approval of George and Nerny. The Detroit Company refused to agree to this proposed modification of the contract, and repeated its offer, formerly made (which had been accompanied by actual tender), to return to the Bickett Company all advances made by it.

Upon hearing, had largely upon affidavits filed by both parties, the court, without opinion, ordered on July 24, 1917, preliminary injunction, restraining the Detroit Company from violating either of the contracts of April 10, 1917, "as modified by the offer of the complainant" by its amended bill, as well as from entering into contracts with Ford or the Matthew Addy Company, or others, for the sale of the mine output. The appeal (which operates as a supersedeas) is from this order.

1. Since the contracts in question were made, a radical change has taken place with respect to the stockholdings in and the control and policy of the Detroit Company. George, Nerny, and Sohn, who represented that company in making the contracts, at first joined in their repudiation and in the defense thereto presented. There is testimony that George, after agreeing to sell Ford part of his stock and giving the latter proxies for voting the bulk of the remainder, contracted to sell to Bickett the bulk of his holdings at a price apparently about par. The amended bill, containing the offer to pay $15,000 for the stock and to increase the coal price, was accompanied by a letter from George recommending acceptance of the offer. Between the writing of the letter and its filing, George had been deposed from office by action of the directors, for alleged hostility to the company's interests, and Kandt was elected to succeed him. Nerny is alleged to have contracted to sell and to have delivered all of his stock to Ford in July, 1917, and the latter, who is alleged to own and to have paid for a substantial block of stock, was elected vice president. He is also treasurer. Sohn seems from the date of the stockholders' meeting to have persisted in his repudiation of the contracts. Kandt and Ford are in harmony with him. As to the effectiveness of some of the stock transfers and stock holdings, as well as to the equities and merits between the parties concerned, there is substantial controversy, and in one or more cases litigation pending; but we need not concern ourselves with these considerations, for their subject-matter was at most addressed only to the exercise of discretion on the part of the District Judge, in granting preliminary injunction.

2. There is persuasive testimony tending to show that the coal price fixed in the sales contract was at the time unconscionably low, including testimony from apparently competent and disinterested witnesses to the effect that at the date the contracts were executed (which was but a very few days after the United States entered the war) the market price of coal in the district in question ranged from $2.50 to $4 per ton, that a fair average price on a yearly contract basis was within about the same range, and that there was no room for profit in mining coal at $1.50 per ton. On the other hand, there was testimony, on the part

251 F.—35

at least of the Bickett Company's representatives, that coal at the mines in question could have been mined and loaded on cars at 95 cents per ton.

If, however, the contract were otherwise valid and specifically enforceable, we should probably not be disposed, on the score of unconscionable coal price, to interfere with the discretion of the District Judge in granting preliminary injunction, especially in view of the Detroit Company's pressing need of financial assistance, the possible lack of certainty at the time that the existing high prices would be maintained throughout the year, the fact that the year for which the price was fixed has now elapsed (prices for the further period being subject to readjustment), and the ability of the court, on final hearing, to effect substantial justice.

[1] 3. The question, however, of the validity of the contract giving Tighe 51 per cent. of the Detroit Company's capital stock for negotiating the two contracts presents other considerations; for if the contract was, as matter of law, invalid and unenforceable, there was no room for the exercise of discretion in granting the injunction. Section 193 of the Constitution of Kentucky provides that:

"No corporation shall issue stocks or bonds except for an equivalent in money paid or labor done, or property actually received and applied to the purposes for which such corporation was created, and neither labor nor property shall be received in payment of stocks or bonds at a greater value than the market price at the time such labor was done or property delivered, and all fictitious increase of stock or indebtedness shall be void."

This constitutional provision is re-enacted by section 568 of the Kentucky Statutes. In Altenberg v. Grant, 85 Fed. 345, 29 C. C. A. 185, this court, in an opinion by Judge Taft, construed this constitutional provision as forbidding the issue of stocks and bonds in exchange for work or property except "when the market price of the labor or property shall be equal to the par value of the bonds or stock exchanged," expressly rejecting the contention that the purpose of the section is fulfilled "if it appears that the work done or property delivered is equal to" the market price of the stock to be issued. This decision has never been overruled or criticized in this court, nor has it been criticized by the Court of Appeals of Kentucky, which, so far as we are advised or have been able to find, has never passed upon the specific provision of the section involved here.[1] We approve of and adhere to this decision.[2]

[1] Reference to the section was made by the Court of Appeals of Kentucky in Clarke v. Lexington Stove Works, 72 S. W. 286, 288.

[2] Altenberg v. Grant is distinguished from Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, 35 L. Ed. 227, by the fact that the Constitution of Kentucky in question was adopted after the decision in the latter case; the former Constitution and statutes containing no provision of that nature. It is distinguished from Clark v. Bever, 139 U. S. 96, 11 Sup. Ct. 468, 35 L. Ed. 88, in the fact that the Iowa statute there involved differed materially from the Kentucky Constitution and Statutes. The provision of the New York Stock Corporation Law involved in Morgan v. Bon Bon Co., 222 N. Y. 22, 118 N. E. 205 (cited by appellee), is distinguished from the provisions of the Kentucky Constitution by what is said in Altenberg v. Grant, 85 Fed. at page 346, 29 C. C. A. at page 186. The latter case is cited with apparent approval in Granite Brick Co. v. Titus (C. C. A. 4) 226 Fed. 557, 567, 141 C. C. A. 313, 323,

[2] Section 569 of the Kentucky Statutes makes express provision for the forfeiture of the charter of a corporation for "abuse or misuse of its corporate powers, privileges or franchises." We are thus clearly bound to hold (even assuming that the contract was otherwise fair enough) that it was not only the right, but the duty, of the Detroit Company to refuse to carry out the stock provision in question. The Detroit Company could not with safety carry it out, even with the approval of a majority of its stockholders; for the record will not sustain an inference that the value of Tighe's services, in negotiating the two contracts between the Detroit Company and the company whose officer he was, equaled $51,000, or anything like that sum; and were we to assume that his services were worth the then market value of the stock to be given to him, it would not help appellee. Nor does appellee's offer, pending litigation, to give $15,000 additional for the stock, help the situation, not only for the reason that, if the contract was in violation of the Constitution of the state when made, it could not be validated by a rejected offer, made pending litigation, to pay even an adequate price, for courts cannot compel parties to make contracts, but for the further reason that the record is equally barren of basis for a conclusion that Tighe's services, plus $15,000, equaled $51,000; in other words, that his services in obtaining the two contracts in question were worth $36,000. The instant case presents peculiar hardship in the fact that Tighe is given, by the provision we are considering, a clear majority of the stock of the Detroit Company, thus enabling an absolute control of the policy and operation of that company, even after the expiration of the sales contract.

[3] Appellee contends, however, that the stock provision is separable from the other provisions of the contract, and that the remaining provisions can be specifically enforced. We cannot assent to this proposition. The finance contract and the sales contract are interdependent and are interwoven; a substantial consideration for the making by the Detroit Company of each of the contracts was appellee's agreement to furnish money for development and operation. Without such assistance from some quarter the Detroit Company could not have developed and operated its mines, and could not have carried out the sales contract. Had appellee offered to cancel the stock provision and to carry out the contract in every other respect, including the making of advances, a different case might be presented. But no such offer or suggestion has been made, and it cannot be assumed that without the stock provision appellee would have been content to make the advances, relying only upon the security of the Detroit Company's ability to make repayment out of profits.

For the reasons stated in the third paragraph of this opinion, the order for preliminary injunction is reversed, with costs, and without considering the question of adequate remedy at law or other defenses urged.