## MORROW *v.* IRON AND STEEL CO.

### (*Nashville.* February 3, 1889.)

1. CORPORATIONS. *Ultra vires. Stipulation in contract for subscription of initiatory capital stock void.*

A stipulation in a contract of subscription to the *original* or *initiatory* capital stock of a *manufacturing corporation*, organized under the *general incorporation law* of this State, is without consideration, *ultra vires*, and absolutely void, where it provides that the subscriber shall receive, upon consideration of his subscription, *bonds to the full amount thereof, secured by first mortgage "upon the company's plant,"* in addition to his stock shares for like amount; and the corporation may repudiate such illegal stipulation without releasing the subscriber from liability for his subscription, or subjecting itself to action by him.

Act construed: Acts 1875, Ch. 142; Code, §§ 1851–1874 (M. & V.).

Cases cited: 17 Wall., 610; 105 U. S., 143.

2. SAME. *Stipulation in contracts for subscription of capital stock. Conditions precedent. Covenants.*

Such stipulation is to be regarded as an independent covenant, and not a condition precedent to payment of subscription, where the subscriber paid part of his subscription in cash, and gave notes for remainder to be paid when called for, and after organization become director of the corporation—especially as the mortgage to secure the bonds was to embrace the "company's plant," to be erected out of the fund subscribed.

Case cited and approved: Railroad *v.* Parks, 86 Tenn., 560.

---

### FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson County. ANDREW ALLISON, Ch.

VERTREES & VERTREES for Morrow.

CHAMPION & HEAD and STEGER & WASHINGTON for Company.

LURTON, J.    The Nashville Iron, Steel & Charcoal Company is a manufacturing corporation, organized in 1887 under the general incorporation laws of this State. Complainant's bill charges that it was organized upon the following scheme or basis, namely:

"The capital stock was fixed at $350,000, in shares of $100 each; the company was also to issue $350,000 of $1,000 negotiable, interest-bearing coupon bonds, to run twenty years, secured, principal and interest, by a first mortgage, in the usual form, upon the company's plant. *Every subscriber was to have bonds and also stock of the company, each to the amount of the subscription*—that is to say, a subscriber to the amount say of $1,000 was to pay $1,000, and therefor was entitled to and was to receive $1,000 of said bonds and $1,000 of said stock of the company."

Complainant alleges that "upon this basis and plan of operations, as the defendant company well knew, your orator    *    *    *    subscribed for $10,000 of said stock and bonds each—that is, he took an interest to the extent of and subscribed $10,000, and he was to pay the said $10,000 upon calls to be made."

Upon this subscription he afterward paid $1,000, and executed his three negotiable notes each for $3,000, and payable in March, April, and May, 1888. Subsequently the corporation refused to carry out the scheme by which subscribers were to receive bonds to an amount equal to their stock, and instead resolved to mortgage their property only to the extent of $100,000, and these bonds they resolved to sell upon the market, applying the proceeds to corporate purposes strictly. This change in the plan of operations seems to have been assented to by all of the subscribers save complainant, who caused his protest to be entered.

The bill alleges that the notes executed by complainant have been transferred to the Commercial National Bank in payment of a pre-existing debt, with notice of the consideration upon which they were executed. This change, the case being heard upon demurrer, together with the fact that the insolvency of the iron company does not appear, justifies us, for the purpose of this case, in treating the bank, as the holder of these stock notes, as standing upon no higher ground than the assignor.

The complainant seeks to be relieved from his subscription upon the ground that the company has refused to carry out its agreement concerning its bonds; that his notes be canceled, and that he have a decree for the money paid in on his subscription. He further prays, in the event he be

held liable upon his subscription, that the contract by which he was to receive bonds be specifically performed.

The bank and the iron company join in a demurrer, which questions the validity and legality of the contract by which the complainant was to receive the bonds of the company. This demurrer was sustained by the learned Chancellor, and the bill of complainant dismissed.

In considering the meaning and legal effect of the contract set up by the complainant it is important at the outset to observe that this is not the case of a *purchase* of stock and bonds, or either, in an *organized* and *going* corporation. Upon the contrary, the bill states that the contract into which complainant entered was that upon which all shares were to be issued, and that the contract between himself and the corporation constituted what the pleader properly designates the "*basis of organization*."

Whether this "basis of organization" be construed to be a contract whereby each subscriber to the stock was to be given a bond as a bonus, or each subscriber to the bonds was to be given paid-up stock as a bonus, or as an agreement by which each contributor to the capital stock was to receive the obligation of the company, secured by a primary mortgage, that he should be repaid the amount of his subscription with interest, such an agreement would clearly be illegal and ineffective as to existing or subsequent creditors of the cor-

poration, either upon the ground that the payment for the stock was unreal and simulated or that the bond had been issued upon no consideration. Morawitz on Corporations, Sec. 824; *Sawyer* v. *Hoag,* 17 Wall., 610; *Scovil* v. *Thayer,* 105 U. S., 143.

The learned counsel for complainant has very ably and earnestly presented the well understood distinction between contracts which are invalid as to creditors, and yet are legal and binding upon the corporation, a distinction well illustrated by the cases just cited from the Supreme Court of the United States; and he insists upon the doctrine of these cases, that however invalid such an agreement may be as against creditors, that inasmuch as all the subscribers to shares were parties to the same agreement with the corporation, that the arrangement and contract cannot be questioned by such stockholders or by the corporation, and that as between the subscriber and the company the agreement is legal and binding.

This presents a question of great importance, and one which is entitled to receive grave consideration at our hands. There are undoubtedly a class of cases where subscriptions to initiatory stock upon special terms, not *prohibited* by the charter and not in *contravention of any clearly defined public policy,* have been, upon sound principles, held valid as between the subscribers and the corporation, and yet invalid in so far as the rights of creditors were affected upon a condition of corpo-

rate insolvency ensuing. To this class of cases belong the cases of *Sawyer* v. *Hoag* and *Scovil* v. *Thayer*. The invalidity of the special terms upon which the contract of subscription rested in these two cases arose from the well settled doctrine that unpaid stock subscriptions constitute a trust fund for the benefit of general creditors, and that any arrangement or device by which a payment of a stock subscription is simulated or released is void in so far as it operates to discharge a liability in favor of creditors by a subscriber to capital stock. In the first of these cases there was a contract whereby the stock was nominally paid in full, but immediately taken back as a loan to the subscriber. Now the only effect of this arrangement was to work a change in the character of the debt, whereby a debt due as for unpaid stock was to become a debt due as for a loan. The debt in the latter case was one which was subject to offsets in the hands of the borrower, while so long as it was a stock debt it was a trust fund, and the debtor could not apply it exclusively upon his own claim against the insolvent corporation.

Concerning the validity of such an arrangement as between the subscriber and the corporation, Mr. Justice Miller said :

" Undoubtedly this transaction, if nothing unfair was intended, was one which the parties could do effectually so far as *they* alone were concerned. Two private persons could thus change the nature of the indebtedness of one to the other if it was

found mutually convenient to do so; and in any controversy which might or could grow out of the matter between the insurance company and the appellant, we are not prepared to say that the company, as a corporation, could deny that the stock was paid in full."

The Court, however, held that, upon a suit by the assignee in bankruptcy of the corporation, the stock had not in fact been paid in such manner as to prevent a recovery for benefit of creditors, and the defendant was not allowed to offset his liability upon his notes given for the alleged loan to him by the company by a claim he held against the corporation.

Concerning this case it is enough to say that the validity of the arrangement as against the company could very well be rested upon the fact that such a lending of money to the share subscriber was not prohibited by the charter of the corporation, and no public policy was violated, in that the corporation had only taken the secured notes of the subscriber in place and stead of his unsecured liability as a share-holder; or these notes stood for and represented an investment of the capital of the company, and being an insurance company expressly permitted to lend out or otherwise invest its funds, no reason occurs why the company should not be regarded as bound by such a change in the character of the debt. The case, however, would be different if such loans, or any other, had been made by a manufacturing corpora-

tion under the general incorporation laws of this State, the lending of money to stockholders being expressly prohibited by such corporation.

In the case of *Scovil* v. *Thayer* the stock was subscribed upon an agreement that upon the payment of twenty per cent., paid-up, non-assessable certificates of stock should be issued to the nominal amount of the subscription. Mr. Justice Hunt, speaking for the Court, said, concerning this contract, that, "as between them and the company, this was a perfectly valid agreement. It was not forbidden by the charter or by any law or public policy, and as between the company and the shareholder was just as binding as if it had been expressly authorized by the charter."

When he came to consider the matter as it affected creditors he said:

"But the doctrine of this Court is that such a contract, though binding on the company, is a fraud in law on its creditors, which they can set aside; that when their rights intervened, and their claims are to be satisfied, the stockholder can be required to pay their stock in full. The reason is that the stock subscribed is considered in equity as a trust fund for the payment of creditors. It is so held out to the public, who have no means of knowing the private contract made between the corporation and its stockholders. The creditor has, therefore the right to presume that the stock subscribed has been or will be paid up, and if it is

not, a court of equity will, at his instance, require it to be paid." 105 U. S., 154.

This case is differentiated from the one now under consideration in several important particulars. First, it is important to notice that the question did not arise between the corporation and· the subscriber. The controversy was between subscribers and the creditors of an insolvent corporation. The point only arose because it became necessary to determine when the right of action in favor of the creditor accrued with reference to the statute of limitations which was plead by the stockholder. In order to defeat this defense the Court held that the arrangement was valid as to the corporation; that in equity the meaning and effect of the agreement was this, namely:

" That the stockholder should pay, say, for example, twenty dollars per share on their stock, and no more, unless it became necessary to pay more to satisfy the creditors of the company; and when the necessity arose, and the amount required was ascertained, then to make such additional payment on the stock as the satisfaction of the claims of creditors required."

The Court, upon this construction of this agreement, held that the statute had not begun to run until the assets of the company had proven insufficient to pay debts.

Again, the contract as between the company and the subscriber was *an executed one*, while here

we have one *executory*, and which the corporation has refused to carry out.

In the third place the Court found that the charter did not prohibit such an agreement, nor was it contrary to any law or public policy of the State of Kansas, where the corporation resided and where the contract was made. But the broadest and most obvious distinction between this case and that will be observed when we analyze the contract set up by complainant and ascertain its legal effect, and then see wherein such a contract is prohibited by the charter of the defendant corporation, and to what extent it may contravene the public policy of this State.

The scheme proposed, upon which this corporation was to be organized, fixed the capital stock at $350,000. The public has a right to presume that this stock has been, in good faith, subscribed, and that it will be paid. They have also the right to presume that the fund thus subscribed and paid in will, in good faith, be retained in the business of the company, and that it, or the plant and property represented by it, will, in good faith, be held and preserved as a capital and basis of credit and confidence. This much is held out to the public by the representation that its capital stock is $350,000. But running along with this proposition that there shall be a capital stock of $350,000 is the additional stipulation that the property of the company, which is to be procured by means of this capital stock, is to be mortgaged

to secure bonds in amount precisely equal to the whole capital stock, and these bonds, instead of being sold for their market value, and the proceeds applied to corporate uses, are to be divided out among the stockholders.

Says complainant in his bill: "Every subscriber was to have bonds and also stock of the company each to the amount of the subscription." The result of this scheme, if it had been carried out, would have been that each subscriber would have received the obligation of the company to repay to him, with interest, his contribution to the capital stock of the company, and this obligation would have been secured by a first mortgage upon all the company's property.

.It was an arrangement whereby the franchise was to be secured, and at the same time deprive the public of the security which by law they are entitled to have, and upon which the grant of the franchise depends. Whatever the real motive and purpose of the promoters of this arrangement may have been, its legal effect, if valid, would have been to have thrown all the risks and hazards of the business upon the public who should deal with it, while the contributors were to reap all possible gains, and should be secured against loss in the event the enterprise proved unprofitable.

Is a contract by which a corporation agrees to repay to the contributors of its capital stock their several contributions, and whereby such contributions are converted into corporate debts, valid even

as against the corporation? Upon what consideration does such an agreement rest? and what power has a corporation to bind itself by such a contract?

It is true, creditors out of the way, that the assets of a private business corporation belong, in the last analysis, to the stockholders, and that they may, by consent, cease business, and divide the property among themselves. But this ownership of assets is subject to the higher and superior rights of creditors, and as against them shareholders have no rights in these assets. No consent of the corporation or of its share-holders can effectually defeat the prior and superior claims of creditors to the corporation property. Upon the winding up of such a corporation creditors must first be paid. The surplus belongs to the stockholders, and this the corporation is bound to divide among them. But by this contract the corporation, in effect, binds itself to return the capital stock to the share-holders at a fixed time—that is, when the bonds mature—regardless of the rights of creditors, and without winding up the business. More than this, the charter expressly forbids the payment of any dividend which impairs capital stock; yet, by this arrangement, dividends are to be paid under the guise of interest, regardless of its effect upon the capital stock of the company.

It is no answer to say that the invalidity of such bonds as to creditors saves all their rights, and that therefore the corporation ought to be

suffered to make such contract with its share-holders as it pleases. This argument ignores two very plain considerations:

*First*—The fact that a defense could not be made by creditors against these bonds if they should pass into the hands of innocent purchasers for value.

*Second*—The public policy of this State, as is evident from its legislation concerning such corporations, forbids the recognition of such an agreement.

The theory upon which the State has rendered the acquirement of the franchise to be a corporation so speedy and inexpensive is based upon the assumption that the capital stock which the company holds itself out as having will be in fact paid in, and will stand as a basis of credit instead of individual liability of those associated in business. To secure a corporate capital which shall be a just substitute for personal liability, the law requires, in explicit terms, that nothing shall be received in payment of the capital stock of a manufacturing corporation but cash, or bonds, or patent rights at a fair and agreed valuation. The charter further prevents the creation of debts beyond the capital stock; it prohibits the lending of money to share-holders or the payment of dividends in excess of actual profits. The plain and obvious meaning of all these requirements, in the light of the substitution of corporate liability in the place of personal liability beyond the amount

of stock subscription, implies that the organization stock shall be paid up in full at its par value. The Courts have not hesitated, either in this State or elsewhere, to denounce every strategem and device by which the payment of stock subscriptions is sought to be avoided.

The facility with which charters are now obtained, the wonderful increase in the number and powers of such organizations, the facilities afforded by the assumption of corporate powers and franchises, to bad and designing men to carry out evil and fraudulent schemes, whereby the public are to suffer, the plainest principles of common honesty and of business integrity demand that these business corporations shall be held to the utmost good faith in this matter of capital stock, and that all such arrangements as that proposed by this "plan of organization" shall be held void and illegal in that it is prohibited by any fair construction of the corporate powers, and in contravention of the plainest and most obvious principles of public policy concerning such companies. Such a contract, being prohibited by law, is therefore beyond the power of the corporation, and is void as to the company, being *ultra vires.*

What we have said as to the construction and legal effect of the subscription involved in this case is not intended to apply to sales of, or subscriptions to, the stock of an *organized and going corporation*, or the sale of the bonds of a going corporation. The necessities of the business of an

organized company might demand an increase of capital stock, and if such stock is lawfully issued, it may very well be offered upon special terms. In such case, if the market price was less than par, it is clear that a purchaser or subscriber for such stock at its market value would, in the absence of fraud, be liable only for his contract price. So a case might arise where the stock of a going concern was much depreciated, and where its bonds were likewise below par, and there was lawful authority to issue additional stock and bonds. Now, in such case, the real market value of an equal amount of stock and bonds might not exceed, or even equal, the par value of either. In such case, all questions of fraud aside, a purchaser would only be held for his contract price. The case we have been considering is that of the issue of the initiatory or organization stock—that class of stock which is to constitute the capital stock upon which the grant of the franchise depends.

Says Mr. Morawitz :

"It is evident, therefore, that the issue of certificates for paid-up shares to a share-holder, whose shares have not in fact been paid up, is unauthorized; it would be a direct infringement of the rights of all existing share-holders in the company, and a source of fraud upon persons giving the company credit, or dealing in its shares thereafter. However, after the capital of a corporation has been reduced by losses, it would not be a wrong against the existing share-holders to issue certifi-

cates for paid-up shares on payment of less than their par value. Under these circumstances fairness and equality would merely require that the new shares be issued at their *actual* or *market* value. If shares in a corporation could in no case be issued at less than their face value, it would be practically impossible to increase the capital of an incorporation by the sale of new shares after the value of its shares had fallen below par." Morawitz on Corporations, Sec. 306.

The corporation having refused to execute this agreement requiring it to issue its bonds to the subscribers for stock, and having determined that such a contract was void and illegal—as beyond the power of the corporation—it cannot, therefore, be specifically executed.

This brings us to a consideration of the question as to whether the refusal of the corporation to execute this illegal agreement relieves complainant from his liability as a subscriber to the capital stock of this company.

His subscription cannot be regarded as one upon a *condition precedent.* He subscribed not upon condition that, before he should be required to pay, the shares and bonds should be delivered to him. On the contrary, his bill shows that he has already paid $1,000 upon his liability, and executed his negotiable notes for the remainder, and he states that he was to pay his subscription "*as calls*" should be made. He clearly contemplated that his subscription should be paid before any bonds were

to be issued, for the bonds were to be secured by a mortgage of the company's plant, and this could not be created except upon the supposition that the capital stock should be paid in, and then *invested in a plant,* which was to be mortgaged to secure the bonds. Where a subscription is taken distinctly upon the condition that it is not to be binding until a stipulated thing is done, then such a subscriber does not become a stockholder, and is not entitled to the rights or charged with the burdens of a stockholder until the condition has been complied with. This Court said, concerning conditional subscriptions:

"The capital of stock companies consists of their stock subscriptions. This is the basis of credit and an essential to organization. This is a trust fund for the benefit of creditors in case of insolvency. Conditional subscriptions to the stock of corporations are unusual, and often operate to defeat subscribers who become such absolutely and upon the faith that all the stock is equally bound to contribute to the hazards of the enterprise. It misleads creditors, and is the fruitful source of litigation and disaster. Tending to the ensnarement of creditors, and contrary to a sound public policy, conditional subscriptions to corporate shares ought not to be encouraged." *Railroad* v. *Parks,* 2 Pickle, 560.

In that case the subscription was payable one-fourth when the railway was completed to the county line; remainder in four equal installments

as the work progressed through the county, upon the *proviso that the company established a depot at Newbern*. The company failed before a depot was established at Newbern, and it was insisted that the subscription was thereby avoided. This Court held that the subscription became absolute upon completion of the road to the county line; that the proviso that a depot should be established at Newbern was not a condition precedent, but an independent stipulation; that the acts to be done were to be done at different times, and hence were independent stipulations, and the remedy of the subscriber was for a breach of the stipulation in his favor. A condition subsequent is thus defined by Mr. Cook in his work on Stockholders:

"A subscription on a condition subsequent contains a contract between the corporation and the subscriber, whereby the corporation agrees to do some act, thereby combining two contracts—one the contract of subscription, the other an ordinary contract of the corporation to perform certain specified acts. The subscription is valid and enforcible, whether the conditions are performed or not. The condition subsequent is the same as a separate collateral contract between the corporation and the subscriber, for breach of which an action for damages is the remedy." Cook on Stockholders, Section 78.

That Dr. Morrow's purpose was to become a share-holder cannot be doubted. The company regarded him as such, and he so regarded himself,

for he not only acted as a stockholder, but became a director of the corporation. Says Mr. Morawitz:

"If it appears that the subscriber intended to become a member of the corporation, and as such entitled to vote at meetings and otherwise enjoy the privileges of membership, it is clear that the subscription cannot be deemed a subscription upon a condition precedent." Morawitz on Corporations, Sec. 89.

It follows from all that we have said that the stipulation concerning the issuance of bonds to subscribers for capital stock was not a *condition precedent* to liability upon the subscription. It was nothing more than an independent stipulation, for the breach of which the remedy would be in damages. The failure of the company to carry out this collateral agreement does not defeat liability upon the subscription. This breached covenant or independent contract was, however, illegal and void, whether regarded as a condition precedent or subsequent, and for such breach no action would lie.

It follows, inasmuch as complainant is liable in equity and at law upon his subscription, that there is no equity whatever in his bill, and the decree dismissing it with costs is affirmed.