GEORGE W. W. SWEENEY *et al. v.* TENNESSEE CENTRAL
RAILROAD COMPANY *et al.*

(*Nashville.* December Term, 1906.)

1. **RAILROAD STOCK SUBSCRIPTION BY CITIES.** State-
ments and provisions that are not conditions precedent.

Statements and provisions in a city's contract of subscription for
stock in a railroad are not conditions precedent to either the sub-
scription by the city or the payment of its subscription, where
the railroad company in its application to the city for subscrip-
tion to its stock, stated that the company was "to be authorized
to issue stock at the rate of $25,000 per mile of completed and ac-
quired road and five per cent first mortgage bonds at the rate of
not exceeding $25,000 per mile of completed and acquired road,"
and followed this statement with a request for a subscription
to its stock to be made by the city "upon the following terms and
conditions," but the terms and conditions there set out no where
embrace a condition that places a limitation upon the stock sub-
scription or bond issue. The terms and conditions set out in
the city ordinance authorizing the subscription to the stock to be
made are not conditions precedent, where such limitation was
not made a condition of subscription or payment. Nor are the
provisions in the ordinance that the company should deposit a
certain sum of its bonds to guarantee a certain extension of the
road and to prevent a foreclosure of the road, and that the prin-
cipal shops of the company should be located in the city, and
for the deposit, on consolidation with other railroad companies,
of a majority of the stock of the consolidated company or con-
stituent companies with a trust company, are not conditions
precedent to either the subscription or its payment. (*Post, pp.*
299-317.)

Cases cited and approved: Railroad v. Parks, 86 Tenn., 560; Mor-
row v. Iron & Steel Co., 87 Tenn., 262.

Sweeney v. Railroad.

2. **SAME. Same. Bill is demurrable for failure to allege non-performance of conditions or stipulations.**

A bill seeking to have a subscription by a city to the stock of a railroad declared void and to enjoin its payment, and alleging, among other grounds and reasons therefor, a failure of the railroad company to locate its shops in the city and deposit certain stock certificates in fulfillment of stipulations of the subscription, is demurrable as to these allegations for failure to allege that the company has located its shops elsewhere, or that it has no purpose of locating them in the city and that it has refused to deposit the certificates or that the city was about to pay its subscription without requiring such deposit. (*Post, p.* 317.)

3. **SAME. City's subscription is special, and all the stock need not be subscribed to make it valid.**

A city's subscription to the stock of a railroad made under the statute (Acts 1887, ch. 3) authorizing the same and prescribing the manner of making, is without an implied condition that the subscription shall be void unless all the stock of the company is subscribed, because it is an independent special subscription by the terms of which the conditions of payment and the times thereof are expressly fixed. (*Post, pp.* 318-322.)

Acts cited and construed: 1887, ch. 3.

Cases cited and distinguished: Read v. Gaslight Co., 9 Heisk., 545; Anderson v Railroad, 91 Tenn., 48.

4. **SAME. Same. Construction company's contract to build the road for the unsubscribed authorized stock is a subscription for all its stock.**

A construction company's agreement with a railroad company to construct its road and receive in part consideration therefor all of its authorized stock, except what had been otherwise subscribed for, is in spirit and legal effect a subscription for all of its stock, and a prior subscription by a city cannot be avoided because of failure to obtain subscriptions to its entire stock. (*Post, pp.* 322-324.)

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County. —JOHN ALLISON, Chancellor.

W. H. COOPER and THOMAS J. TYNE, for complainants.

PITTS & McCONNICO, JOHN M. DICKINSON and ALEX. P. HUMPHREYS, for defendants.

MR. CHIEF JUSTICE BEARD delivered the opinion of the Court.

The complainants are citizens and taxpayers of the city of Nashville, and they file the present bill, on their own behalf and on behalf of other taxpayers of that city, the purpose of which is to have declared void a subscription made by the mayor and city council of Nashville for $1,000,000 of the capital stock of the Nashville & Clarksville Railroad Company, one of the constituents of the consolidated railway companies now known as the "Tennessee Central Railway Company," and for a decree inhibiting the city's use of its bonds or cash in payment of this subscription. The bill was dismissed on demurrer, and now, on appeal, the complainants are urging the same contentions decided against them in the court below.

The first of these contentions, and the one most earnestly pressed, is that as a condition precedent to the city's contract of subscription for this stock it was agreed that the Nashville & Clarksville Railroad Company should not issue more than $25,000 of bonds per mile for roads constructed or to be constructed, and that in violation of this condition the corporation had placed upon its property secured bonds amounting to $37,000 per mile.

Taking the bill and exhibit thereto, we find that on the 21st of June, 1901, the Nashville & Clarksville Railroad Company, by its president, Mr. Jere Baxter, submitted an application in writing to Mr. J. M. Head, the then mayor of Nashville, asking for a subscription to the capital stock of that corporation by the mayor and city council of Nashville in the sum of $1,000,000. This application as originally filed with the mayor was as follows:

"Nashville, Tennessee, June 21, 1901.
"Hon. Jas. M. Head, Mayor of the City of Nashville:

"The Nashville & Clarksville Railroad Company, a corporation organized and existing under the laws of Tennessee, proposes to construct a standard-gauge steam railroad from a point within the corporate limits of the city of Nashville, Tennessee, connecting with the tracks of the Tennessee Central Railroad Company, or those of the Nashville Terminal Company, and crossing the Cumberland river by a bridge, to be constructed either by the Nashville & Clarksville

Railroad Company or by the said terminal company, to a point within the limits of the city of Clarksville, Tennessee, and beyond the latter point in a northwestern direction to a point in the county of Montgomery, Tennessee, at the State line between the States of Tennessee and Kentucky, the same to be authorized to issue stock at the rate of $25,000 per mile of completed and acquired road, and five per cent. first-mortgage bonds at the rate of not exceeding $25,000 per mile of completed and acquired road, and respectfully asks a subscription to its capital stock by the mayor and city council of Nashville in the sum of $1,000,000 upon the following terms and conditions:

"First. Construction of said line of railroad to be commenced at Nashville within six months from the date of subscription, and completed from that point through the county of Davidson within twelve months, and to the city of Clarksville within twenty-four months, from date of subscription. Delays caused by injunction or bona fide litigation are not to be counted as part of any said periods.

"Second. No part of the subscription to become due and payable unless and until the said railroad company shall have constructed and put in operation, within the time fixed in this application and substantially in the direction and on the lines as shown on the plan or map which is attached hereto, that portion of its railroad located within the county of Davidson, and upon the completion and operation of that portion of

the road one-half of the said subscription shall become due and payable, and upon its payment the said railroad company shall issue and deliver to the said mayor and city council of Nashville an equal amount of certificates of its capital stock.

"Third. The balance of the subscription shall be due and payable when the entire line of railroad from Nashville to Clarksville shall have been constructed and put in operation, and upon said payment certificates for an equal amount of the capital stock of said railroad company shall be issued and delivered to said mayor and city council of Nashville.

"Fourth. Payments for said stock may be made by said mayor and city council of Nashville, either in cash or its 20-year coupon bonds, bearing interest at four per cent. per annum, payable semi-annually, as the said mayor and city council of Nashville may elect.

"Fifth. The expenses of the election to be held under this application to be paid by the Nashville & Clarksville Railroad Company, and the amount thereof will be deposited with the city treasurer within five days after the election is ordered.

"Attached to, and made a part of this application is a plan or map, certified by the chief engineer of the Nashville & Clarksville Railroad Company, showing the general direction of the line of its roads; and it declares that it will locate and construct its said railroad substantially in accordance with said plans or map be-

tween the said cities of Nashville and Clarksville, and substantially as stated in this application.

"You are respectfully asked to call a special meeting of the board of mayor and city council of the city of Nashville and submit this application to it for its consideration as provided by law, to the end that it may determine whether an election by the qualified voters of the city of Nashville shall be held to determine whether or not the subscription shall be made.

"This application is made under and in accordance with the provisions of Acts 1887, p. 57, c. 3, of the general assembly of the State of Tennessee.

Respectfully,

"NASHVILLE & CLARKSVILLE RAILROAD COMPANY,
[Seal.]     By JERE BAXTER, President.

"Attest:     W. B. EASTMAN, Secretary."

A number of communications thereafter were exchanged between Mr. Baxter, as president of this company, and Mr. Head, the mayor of the city, one purpose of which, on the part of Mr. Baxter, was to disclose for the full information of the citizens of Nashville the plans of himself and associates in regard to the buiding of the new road and its consolidation with other lines of railways, controlled by the same parties, which ran east of Nashville. It is unnecessary to set out these communications, as they in no degree reflect light on the particular point now being considered. It is sufficient to say that this correspondence led in some degree to a change in or an amendment of the original application.

This amended application was in the same language as was the original, except that paragraphs 2 and 3 were so amended as to read as follows:

"Second. · No part of the subscription to become due and payable unless and until the said railroad company shall have constructed and put in operation within the time fixed in this application, and substantially in the direction and on the line as shown by the map which is attached hereto, that portion of the railroad located within the county of Davidson, and shall have provided for and accepted upon its board of directors upon the request of the mayor and city council of Nashville, at any time after it shall have made said subscription, two members named for directors by resolution of said mayor and city council, and upon the completion and 'operation of that portion of the railroad, and compliance with above condition as to representation of the mayor and city council upon its board of directors, one-half of said subscription shall become due and payable, provided the bridge across Cumberland river shall have been completed; otherwise, when said bridge is completed, and upon its payment, the said railroad company shall issue to said mayor and city council of Nashville an equal amount of certificates of its capital stock.

"Third. The balance of the subscription shall be due and payable only when the following conditions precedent shall have been complied with:

"(1) When the entire line of railroad from Nash-

ville to Clarksville shall have been constructed and put in operation as proposed; and

"(2)   When the said Nashville & Clarksville Railroad Company shall have made and filed with the mayor of the city of Nashville a bond in the sum of $500,000, payable to the mayor and city council of Nashville, with good security, to be approved by the mayor, conditioned that said Nashville & Clarksville Railroad Company, or a consolidated company of which it may form a part, shall within three years from the subscription (delays caused by injunction or *bona fide* litigation excepted) extend its line of railroad from Clarksville to a connection with the Illinois Central Railroad, either by construction or acquiring by purchase or lease a line of railroad to such connection; and

"(3)   When the syndicate, composed of Jere Baxter and his associates, shall have deposited with the Union Bank & Trust Company, of Nashville, Tennessee, or with some other responsible depositary of Nashville, to be approved by the mayor of Nashville, first mortgage bonds of either the Nashville & Clarksville Railroad Company, or the consolidated company of which it may form a part, belonging to said syndicate jointly or severally, of the aggregate sum of $500,000, accompanied with an agreement, duly executed by them, empowering said depositary to hold said bonds as trustee, first, as a guaranty that the conditions of the above-mentioned bonds shall be kept and performed; and

118 Tenn—20

"(4)    Thereafter as a guaranty to protect the consolidated line between the Illinois Central Railroad on the west, and the Southern and Cincinnati Southern Railroads on the east, in the event of the consolidation or amalgamation of the said Nashville & Clarksville Railroad Company with the lines running east and north by way of Lebanon and Cookeville, against foreclosure for the period of five years from the date of the completion and putting in full operation of said consolidated line, with power in said trustee to sell from time to time so much and such amounts of said bonds as may be necessary, if any, during said period, to meet any deficiency of earnings that may threaten foreclosure, and apply the proceeds to the payment of such deficiency, any sum so used to be replaced out of the surplus profits that may be subsequently earned; and

"When these things shall have been done, the said balance of the subscription shall be due and payable, and upon its payment certificates of an equal amount of the capital stock of said railroad company shall be issued and delivered to the said mayor and city council of Nashville."

This application in its amended form having been submitted to the board of the mayor and city council of Nashville, that board ordered an election to be held, in order that the qualified voters of the city of Nashville might determine whether or not the municipality should make the subscription to the capital stock of the Nashville & Clarksville Railroad Company as asked. The

election thus provided for was held, with the result
that a statutory majority of the qualified voters of the
city of Nashville authorized the subscription, and there-
upon an ordinance was passed by the board of mayor
and city council of Nashville by the terms of which the
mayor was authorized to subscribe to the capital stock
of the railroad company. This ordinance, after setting
forth in great detail the application for the subscription
and the correspondence that ensued between the mayor
and Mr. Baxter, concluded as follows:

"Now, therefore, in consideration of the premises:

"Section 1. Be it enacted by the mayor and city
council of Nashville, that the mayor of the city be, and
he is hereby, authorized, empowered and directed for
and on behalf of the mayor and city council of Nashville,
to subscribe for one million dollars of the capital stock
of the Nashville & Clarksville Railroad Company, in
accordance with the terms and provisions of said appli-
cation and the following additional agreements and
stipulations of said Nashville & Clarksville Railroad
Company, evidenced by the correspondence above set
out, to wit:

"First. That all the claim of the Nashville, Flor-
ence, etc., Railroad to the subscription of one million
dollars, voted to it by the city of Nashville on the 15th
day of December, 1900, shall be abandoned and a signed
decree to that effect to be entered in the case of *W. W.
Berry et al.* v. *Mayor and City Council of Nashville et
al.*, now pending in the chancery court of Davidson

county, as soon as the subscription herein provided for shall be made.

"Second. That no convict labor shall be employed in the construction of the proposed line of railroad of said Nashville & Clarksville Railroad Company between Nashville and the Tennessee and Kentucky State line, northwest of Clarksville.

"Third. That the principal shops of the said Nashville & Clarksville Railroad Company, or any consolidated company of which it may form a part shall be located within the corporate limits of the city of Nashville.

"Fourth. That no consolidation of the Nashville & Clarksville Railroad with other lines of railroad, and no additional subscription to or issuance of its capital stock, except such as may be authorized at $25,000 per mile, on the line between Nashville and the State line, northwest of Clarksville, shall be had or attempted until the mayor and city council of Nashville shall have become subscriber for one million dollars of the capital stock of the Nashville & Clarksville Railroad Company, and that then no additional subscription shall be made, and no stock shall be issued, and no consolidation with other roads shall be had, or attempted, except by a majority vote of the stock already subscribed: Provided, that the subscription already provided for being made by the mayor and city council of Nashville, the stock so subscribed shall be voted by the properly constituted representatives of the city in favor of the purchase by,

or the consolidation of, the Nashville & Clarksville Railroad Company with the other railroad corporations mentioned in the pooling arrangements of Jere Baxter and his associates, of June 15, 1901, a copy of which was submitted to and filed with the mayor of Nashville at the time the application for said subscription was made, and referred to in the preamble of this ordinance, and in accordance with the terms and provisions of said agreement.

"Fifth.    That upon the consolidation of the Nashville & Clarksville Railroad Company with the other railroad companies mentioned in said pooling agreement of June 15, 1901, or upon the acquisition or purchase of their properties by said Nashville & Clarksville Railroad Company, as provided for in said agreement in the above fourth paragraph whereof, it shall be a part of the agreement, or contract, which effectuates such consolidation, or purchase, that a majority of the stock of the several constituent companies, or majority of the stock of the consolidated, or purchasing company, for which they may be exchanged, exclusive of the stock held by the city of Nashville, and also a majority of the stock of the Nashville Terminal Company, shall be deposited with the Union Bank & Trust Company, of Nashville, Tennessee, as trustee, or some other trust company satisfactory to the mayor of said city, to be held and voted by it in all stockholders' meetings for a period of ninety-nine years under an irrevocable proxy, and against all propositions and schemes looking to the sale

or lease of the companies' lines to, or consolidation with, either the Louisville & Nashville, or the Nashville, Chattanooga & St. Louis Railroads, or any successor to or representative of either of said roads, and against all propositions and schemes tending to or having for their subject, directly or indirectly, the merger or amalgamation, in any manner or form, of said lines or consolidated line with said lines now here, or their, or either of their successors and representatives or assigns. Such majority stock shall be deposited with said trustee under all the terms and conditions set out in the pooling agreement submitted to and filed with the mayor of Nashville at the time the application, or subscription, was made and referred to in the preamble of this ordinance.

"Sec. 2.  Be it further enacted that the said subscription shall be authorized to be made by the mayor, and before the same is made, the Nashville & Clarksville Railroad Company, by and through its constituted officers, shall file in the office of the recorder, in said city, its acceptance in writing, whereby it shall agree to accept and abide by the terms and provisions of this ordinance, and shall agree to do and perform all the conditions, acts and things set forth in the foregoing proposition, the amendments thereto, and the above amendments thereto, and the above additional agreements and stipulations heretofore made by or on behalf of the Nashville & Clarksville Railroad Company.

"Sec. 3.  Be it further enacted, that this ordinance

shall take effect from and after its passage, the welfare of the city requiring it.

"Approved October 10, 1901.

"J. M. HEAD, Mayor."

The present bill shows that the Nashville & Clarksville Railroad Company, through its regularly constituted officers, filed in the office of the recorder of the city its acceptance in writing in full accord with the requirements of section 2 of the ordinance above, and the subscription was made.

It will be seen that the ordinance set out above does not in express terms make the subscription of the city of Nashville, or its payment, depend as a condition precedent upon the railroad company's keeping its bond issue within the limits of $25,000 per mile, nor does it by necessary implication.

Returning, now, to the application submitted by Mr. Baxter on the 21st day of June, 1901, and afterwards amended, as hereinbefore set out, it will be observed that reference to the issuance of stock and bonds is made in its opening paragraph. This paragraph states the general purposes of the Nashville & Clarksville Railroad Company, its contemplated line from a point in the city of Nashville to a point in Montgomery county on the line between the States of Tennessee and Kentucky; "the same [that is, the railroad] to be authorized to issue," etc. These premises being thus stated, the paragraph concludes as follows: "And [it, the railroad] respectfully asks a subscription to the capi-

tal stock," etc., "upon the following terms and condi-
tions." These terms and conditions are then set out,
and they nowhere embrace a condition that places a
limitation upon the bond issue.

It is true the ordinance sets out the application for
this subscription and the various propositions and
counter propositions intermediate between the two, but
we are unable to find anywhere in this record an inti-
mation that either party regarded the limitation on the
bond issue as one of the conditions upon which the sub-
scription or its payment should depend. The applica-
tion asks for the subscription "upon certain terms and
conditions," which are set out distinctly, and the ordin-
ance with equal distinctness states the "terms and con-
ditions" upon which the mayor was authorized to make
this subscription; but this was not one of them. There
can be no doubt, in view of the great care and particu-
larity observed in the entire transaction, from the sub-
mission of the application to the passage of the ordin-
ance, that if it had been in the minds of the
contracting parties that this limitation should be a
condition precedent to the subscription, or to
the payment for the stock when subscription was
made, that there would have been no omission
in stating it with the same distinctness with
which the other terms and conditions were set out. We
think in this case the counsel of the defendant railroad
company may well invoke the maxim *"Expressio unius
est exclusio alterius,"* and that the same counsel have

properly asked "whether a contract which expresses and sets out with the utmost detail certain conditions precedent upon which a certain part of the contract is to depend, and certain other conditions precedent upon which a certain other part of the contract is to depend, shall be avoided in its entirety by a condition not expressed at all." To work the result which complainants claim in this contention would, as insisted by the defendant, be to reach out and make a new contract for the parties, not contemplated by them, rather than to construe one they have made for themselves.

It is necessarily inferable from the bill and exhibit that the mayor, having subscribed for $1,000,000 of shares of stock of the company, the municipal authorities were preparing to discharge in cash or bonds this stock liability, when the present bill was filed. It is further inferable that the consolidation of the Nashville & Clarksville Railroad Company with the lines of railway running east and north, referred to in the correspondence and ordinance, has taken place. This being done, complainants come at this late day, asking for the invalidation of the stock subscription and an inhibition against the issuance of bonds, or, if issued, against their sale to discharge this liability, upon the ground that this was a conditional subscription.

While it is true that, "where a subscription is taken distinctly upon the condition that it is not to be binding until a stipulated thing is done, then such a subscriber does not become a stockholder . . . until the

condition has been complied with." (*Morrow* v. *Iron & Steel Co.,* 87 Tenn. 262, 10 S. W., 495, 3 L. R. A. 37, 10 Am. St. Rep. 658), yet such a subscription is looked on with disfavor by the courts. As is said in *Railroad* v. *Parks,* 86 Tenn. 560, 8 S. W. 844: "The capital of stock companies consists of their stock subscription. This is a basis of credit and an essential to organization. This is a trust fund for the benefit of creditors in case of insolvency. Conditional subscriptions to the stock of corporations are usually and often operated to defeat subscribers, who become such absolutely and upon the faith that all the stock is equally bound to contribute to the hazards of the enterprise. It misleads creditors, and is the fruitful source of litigation and disaster. Tending to the ensnarement of creditors, and contrary to sound public policy, conditional subscriptions to corporate shares ought not to be encouraged."

In the case last named the subscription was payable one-fourth when the railway in question was completed to the county line, and the remainder in four equal installments as the work progressed through the county, upon the proviso that the company established a depot at Newbern. The company failed before the depot was established at Newbern, and it was insisted that the subscription was thereby avoided; but this court held that the subscription became absolute upon completion of the road to the county line; that the proviso that a depot should be established at Newbern was not a condition precedent, but an independent stipulation; that

the acts to be done were to be done at different times, and hence were independent stipulations, and the remedy of the subscriber was for a breach of the stipulation in his favor.

In the *Morrow Case* an effort was made to avoid a subscription to the capital stock of a corporation upon the ground that a stipulation in the contract of subscription provided that the subscriber should receive, in consideration of his subscription, in addition to his shares of stock, bonds to the full amount thereof, secured by first mortgage upon the company's plant; this stipulation not having been complied with. It was held, however, that the stipulation was *ultra vires* and absolutely void, and, in addition, that it was to be regarded as an independent covenant, and not a condition precedent to the payment of subscription.

It will be found that the authorities make a broad distinction between a conditional subscription and a subscription upon special terms, or, in other words, between a condition precedent and a covenant agreement or stipulation. In Clark & Marshall on Private Corporations, vol. 2, p. 1420, it is said: "Conditional subscriptions, or subscriptions upon conditions precedent, must be distinguished from subscriptions upon special terms. . . . Conditional subscription . . . does not make the subscriber a stockholder or render him liable to pay the amount of subscription until the performance or fulfillment of the condition. A subscription upon special terms, on the other hand, is an

absolute subscription, making the subscriber a stockholder and rendering him liable as such as soon as it is accepted; the special term being an independent stipulation, for a breach of which the subscriber's remedy is against the corporation for damages, or else a stipulation affecting merely the mode or extent of payment or the rights of the subscriber as a stockholder. . . . In case of doubt as to the intention of party, a subscription should be construed as an absolute subscription upon special terms, rather than as conditional." In 1 Cook on Corporations, section 85, it is said: "Conditional subscriptions, like other contracts, are to be construed reasonably and according to the the intent of the parties as indicated by the language used in the contract. The circumstances under which the subscription was made are also to be taken into consideration. Of two interpretations, that which facilitates the enterprise is preferred to that which retards it."

We are perfectly satisfied that, if the statement made in the application for this subscription can be said to rise even to the dignity of a stipulation, it must be treated as an independent covenant, and in no sense is to be considered as a condition precedent to either the subscription of the stock or the payment for it when the subscription was made, and the chancellor's ruling in this respect was without error.

What has been said in disposing of the first contention of the complainants may be repeated, even with

greater emphasis, with regard to those parts of the bill in which they claim relief for the city of Nashville against its contract of subscription upon the several grounds  .  .  .  that the railroad company has not located its shops within the city as it agreed to do, nor have the constituent companies nor the consolidated company deposited a majority of its or their certificates of stock with the Union Bank & Trust Company, as trustee, or some other trust company satisfactory to the mayor to be held and voted as provided in section 5 of the ordinance hereinbefore set out.   No averment is made in the bill, nor, in the face of the exhibit to the bill, could it be made with candor, that the performance of these acts were conditions precedent to the liability of the city on its subscription.   It is clear that the agreements with regard to these matters were mere stipulations, or special terms, for the breach of which the city of Nashville will have its action.   *Railroad* v. *Parks*, supra.   In addition, however, the bill as to them was properly dismissed on demurrer, because it fails to allege that the company has located its shops elsewhere,  or  that  it has no purpose of locating them in the city of Nashville, and equally fails to allege that  the  railroad  has refused to make the deposit of a majority of its stock certificates as required by the ordinance, or that the city was about to pay its subscription without requiring such deposit. The assignments of error to the action of the court in these particulars are therefore overruled.

The complainants further alleged, as a ground for relieving the city of Nashville, that the defendant railroad company had not as required by section 3 of the ordinance, deposited with the Union Bank & Trust Company, or with some other responsible depositary ot Nashville, . . . first-mortgage bonds of either the Nashville & Clarksville Railroad Company, or of the consolidated company of which it may form a part, of the aggregate sum, of $500,000, to guarantee a bond of like amount, which the company was required to execute to the city conditioned that within three years from the date of the subscription the said railroad company . . . should extend its line of railroad from Clarksville to a connection with the Illinois Central Railroad, and also as a guaranty against foreclosure of the said railroad . . . for the period of five years from the date of the completion and putting of said consolidated line into operation. It is evident, however, that this agreement was in the nature of a condition subsequent, and the chancellor was right in sustaining the demurrer to this part of the bill, and the assignment or error to his action in this regard is overruled.

The complainants filed an amendment to the original bill in which they allege, as an additional ground for relief, that the agreement of the city of Nashville to subscribe for this stock was on an implied condition precedent that all of the capital stock of the Tennessee Central Railroad Company should be subscribed, and this condition, it is alleged, has not been performed.

The basis for this insistence, it is assumed, by coun-
sel, is to be found in the cases of *Read* v. *Memphis Gas-
light Co.*, 9 Heisk., 545, and *Anderson* v. *Railroad*, 91
Tenn., 48, 17 S. W., 803. The principle upon which these
authorities rest is that, where the amount of stock is
specified in the charter, articles of association, or con-
tract of subscription, or fixed by the corporators when
authorized to settle the same, then and there does exist
an implied condition precedent that all of such stock
shall be actually taken before the subscribers can be
made liable. But, as is said in *Anderson* v. *Railroad*,
supra, "the implication may be rebutted by the terms
of the charter, or the provisions of the enabling act,
articles of association, action of stockholders or
corporators fixing capital, or by the conditions
of the contract of subscription." In the two cases
mentioned above, the liability in question was that of
subscribers who obligated themselves to the corporation
in question and to each other to pay for stock sub-
scribed by them; the amount of the capital stock of the
company being fixed either in the charters or by the cor-
porators as among themselves. In such a case there is
no doubt that there is an implied condition precedent
that the whole capital stock provided for shall be sub-
scribed before any one of the subscribers can be com-
pelled to respond to a call made upon his subscription.
But that is not the case with which we are dealing. This
is a subscription of the city of Nashville, authorized
and made under and by virtue of chapter 3, p. 57, of the

Acts of 1887, and the subscription of the city of Nashville is independent of all other subscriptions. We are satisfied, with regard to this act, as well as to the character of the contract entered into between the city and railroad company, that the implication that all of the stock required to complete this enterprise should be taken before the city could be liable upon its subscription is clearly rebutted by the condition of the contract of subscription. Upon such a subscription no call was necessary as in the case referred to. By its very terms it is special in its nature, expressing distinctly the conditions of payment and the time, or times at which payments are to be made.

With regard to such a subscription Clark & Marshall on Private Corporations, in volume 2, pp. 1544, 1545, say: "The general rule that subscriptions are upon the implied condition that the full amount of the capital stock shall be subscribed does not apply where a contrary intention appears from the charter or enabling act, or unless it is required by the charter or enabling act as a condition precedent to corporate existence where a contrary intention appears from the provisions of the articles of association, or by the action of the stockholders or directors fixing the capital stock, or by the terms of the contract of subscription. If it appears therefrom by express terms or clear implication that it was intended that the corporation should or might engage in business before subscription of full amount of its capital stock, to make contracts, create debts, or do any other

act involving a necessity to call upon stockholders to pay their subscriptions, it cannot be implied that it was intended to make the subscription of the whole amount of the capital stock a condition precedent to liability on subscriptions, and it will not be so held."

On page 1525 of the same volume these authors say: "Whether or not a call is necessary to render a subscriber liable to an action on his subscription depends upon his terms of contract of subscription. . . . No call is necessary, when a subscription is payable, not upon call or demand by the directors or stockholders, but immediately, or on a specified day, or on or before a specified day, or when it is payable in installments at specified times. In such cases it is the duty of the subscriber to pay the subscription, or installment thereof, as soon as it is due, without any call or demand, and if he fails to do so an action may be brought at any time." In support of these texts the authors cite many well-considered cases.

As will be observed in reading the amended application, upon the terms and conditions of which the mayor and council of the city of Nashville, the times for the payment of this subscription in installments are distinctly fixed, and whenever the conditions upon which these payments were to be made had been complied with by the railroad company, then, without more, it became the duty of the city of Nashville to make these payments. No notice was required from the railroad company, or

demand upon the municipal authorities, in order to qualify itself to demand the payment, thus putting this contract directly within the rule announced by these authorities.

But, if this is not a sufficient answer to the insistence of complainants made in this amendment, we think one is found in the exhibit to the amended bill, which shows that the Tennessee Construction Company, a corporation organized under the laws of Missouri, agreed to construct the Nashville & Clarksville Railroad from Nashville to a point on the Tennessee and Kentucky State line, and to reimburse the railroad for all moneys laid out and for all debts incurred by it prior to the 1st of May, 1902, of every legal kind, and in consideration thereof was to receive from the Tennessee Central Railway Company all the capital stock and bonds of the company, less the amount of subscriptions of the mayor and city council of Nashville, the county of Cheatham, and the city of Clarksville; and under the agreement the Tennessee Construction Company was to receive in the end the proceeds of these municipal and county subscriptions.

It will be seen, by a reference to Exhibit A of the original bill, that the railroad company contemplated the issuance of stock at the rate of $25,000 per mile of completed and acquired road, while Exhibit B to the amended bill shows that this amount, which it may be fairly assumed was the full capital stock of the defendant company, was agreed to be taken by the construction

company in part of the consideration of the work that it was to do, and of the moneys to be paid by it in reimbursing the railroad company for loans made and expenses and debts incurred by that company in prosecuting its enterprise up to that time. The third article of Exhibit B shows, among other things, that the defendant railroad company bound itself, in consideration of the construction and equipment of the new road from Nashville to Clarksville, and other covenants of the Tennessee Construction Company, to pay and issue to said company "of the capital stock of the railroad a sum equal to $25,000 per mile of completed line of railway, extensions, spurs, and branches hereafter constructed by the contractor as aforesaid, and upon same mileage basis less $1,000,000 thereof, subscribed for by the mayor and city council of Nashville, $50,000 thereof subscribed for and by the county of Cheatham, and $100,000 thereof subscribed for by the city of Clarksville, and less the amount of any additional subscriptions which have heretofore been, or may hereafter be, obtained by the railroad, based upon said line of railroad, extensions, spurs, and branches so hereafter constructed by the contractor, either in its present corporate name, or in its former name of Nashville & Clarksville Railroad Company."

We think that the agreement upon the part of the construction company to take this stock, being the full amount of the capital stock, in discharge of the work done in the construction of the line of railway, and of

moneys to be paid for the reimbursement of the railroad company, made the construction company, in spirit and legal effect, a subscriber to the capital stock of the railroad company, and if there was, as insisted, an implied condition precedent, that the capital stock of the railroad company should be subscribed in order to the enforcement of the claim against the city of Nashville upon its subscription, that it has been fully met in the contract referred to.

So it is, we think, the demurrer of the defendant to this phase of the bill was well taken, and that upon all the grounds heretofore set out and considered the chancellor was not in error in dismissing the bill, and his decree in doing so is affirmed.

The costs of the cause will be paid by the complainants and the sureties upon their several bonds.