WITT v. NELSON et al.  (No. 5378.)†

(Court of Civil Appeals of Texas. Austin. May 26, 1914. Additional Findings of Facts, July 1, 1914.)

1. CORPORATIONS (§§ 244, 544*)—RIGHTS OF CREDITORS—TRUST FUND THEORY.

The capital stock of a corporation is a trust fund for the benefit of creditors, who may enforce the payment therefor in full, as against subscribers for such stock and transferees with knowledge of nonpayment.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 960–977, 2162–2169; Dec. Dig. §§ 244, 544.*]

2. CORPORATIONS (§ 232*) — STOCKHOLDERS — LIABILITY OF.

Where half of the capital stock of a corporation was paid in upon organization in accordance with the law at the time of organization, and the corporation later became in need of funds to carry on its business, the sale of treasury stock at the fair market price, though for less than par, in accordance with Rev. St. 1895, art. 661, authorizing the sale of such stock, would not render the purchaser liable for any sum in addition to the price paid.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 879, 880, 883, 884, 987; Dec. Dig. § 232.*]

3. CORPORATIONS (§ 249*)—STOCKHOLDERS—TRUST FUND THEORY.

Where the principal stockholder and manager of a corporation advanced money to the corporation with knowledge of the stockholders and other directors, he may, upon being held liable for an unpaid amount on his stock, set off his claim against that of the corporation's creditors; the money advanced having become part of the corporate assets.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1002–1010, 1012, 2273; Dec. Dig. § 249.*]

4. CORPORATIONS (§ 232*)—STOCKHOLDERS—LIABILITY OF.

Where, upon organization of a corporation, half of its capital was paid in and stock issued therefor, and thereafter stockholders became indebted to the corporation, which took over their shares, a subsequent purchaser of such shares, who bought for a sum less than par, is not liable to the creditors of the corporation, under the trust fund theory.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 879, 880, 883, 884, 987; Dec. Dig. § 232.*]

Appeal from District Court, McLennan County; Tom L. McCullough, Judge.

Action by Edgar E. Witt, trustee, against E. Nelson and another. From a judgment for defendants, plaintiff appeals. Affirmed.

Davis & Cocke, of Waco, for appellant. Sleeper, Boynton & Kendall and Gallagher & Stratton, all of Waco, for appellees.

Findings of Fact.

JENKINS, J.  (1) In 1902 and prior thereto, T. H. Kessler & Co., a copartnership composed of T. H. Kessler, —— Troutschold, A. J. Droke, and R. G. Ard, owned and operated a planing mill.

(2) It was agreed by the members of the firm and Oscar Myre, an employé of the firm, that they would incorporate, and that Myre would buy Troutschold's interest.

(3) On August 25, 1902, a charter was obtained in the name of T. H. Kessler & Co., with an authorized capital of $30,000.

(4) On September 2, 1902, a proposition was submitted to the directors of the corporation by T. H. Kessler for the partnership, to sell to the corporation all of the property of the firm for $15,000, which proposition was accepted by the corporation.

(5) On September 2, 1902, the partnership T. H. Kessler & Co. conveyed to the corporation T. H. Kessler & Co. all of its assets for the recited consideration of $30,000.

(6) On the same day the corporation issued to the members of the firm of T. H. Kessler & Co., including Myre, who agreed to take Troutschold's interest, 150 shares of stock of the par value of $100 each in proportion to their interest in said firm, as follows: T. H. Kessler, 51 shares; Oscar Myre, 48 shares; A. J. Droke, 36 shares; R. G. Ard, 15 shares.

(7) After issuing the 150 shares, as above stated, there remained unissued 150 shares of the par value of $100 each.

(8) On October 9, 1902, by order of the directors, 40 shares of the capital stock were sold to J. M. Nelson for $2,000, and a certificate for that number of shares was issued to him.

(9) T. H. Kessler remained a director of the corporation until January, 1903, at which time he died, and his wife, Mrs. T. H. Kessler, became the owner of his shares and was elected a director.

(10) On January 26, 1903, a resolution was entered upon the minutes allowing Mrs. Kessler to draw $10 per week to be charged to her account, and, when net earnings had been declared, her part of same to be credited on her account, and, if her account was then found to be overdrawn, she to pay the balance or same to be charged against her stock at her option.

(11) On October 5, 1905, a motion was passed to sell A. L. Elliott $5,000 of "treasury stock" at 75 cents on the dollar per share. Mrs. L. E. Elliott, wife of A. L. Elliott, paid for $2,000 of this stock at 75 cents on the dollar. A. L. Elliott gave his note for 30 shares, with his stock as collateral. He paid interest on his note to July 21, 1908, but none of the principal. On July 21, 1908, by order of the directors, Elliott returned the 30 shares of stock, and his note was surrendered to him.

(12) On July 16, 1906, the certificate for 40 shares issued to J. M. Nelson was by him transferred on the back thereof to E. Nelson, and the same was delivered to E. Nelson.

(13) On May 29, 1907, Mrs. Kessler was

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

† Application for writ of error pending in Supreme Court.

indebted to the corporation in the sum of $3,164.73, which, by order of the directors, she was permitted to and did pay by surrendering her certificate for the 51 shares issued to T. H. Kessler, and receiving a certificate for 19 shares.

(14) On May 29, 1907, by order of the board, $5,000 of stock was sold to J. S. Harrington at 75 cents on the dollar.

(15) On May 29, 1907, it was ordered by the directors that $1,000 of stock be sold to E. Nelson at 75 cents on the dollar, but this stock was never issued.

(16) On May 29, 1907, E. Nelson was elected a member of the board of directors, vice J. M. Nelson, who had sold his 40 shares of stock to E. Nelson.

(17) On May 29, 1907, two additional shares were sold to Oscar Myre, at 75 cents on the dollar.

(18) Prior to March 24, 1908, A. J. Droke had died, and his widow had become the owner of his stock. On that date, Mrs. Droke having become indebted to the corporation in the sum of $500, and Mrs. Kessler having become indebted to the corporation in the further sum of $900, by order of the directors they paid these debts by Mrs. Droke's surrendering the certificate for 36 shares issued to A. J. Droke, and a new certificate for 31 shares was issued to her, and by Mrs. Kessler's surrendering her certificate for 19 shares, and a new certificate for ten shares was issued to her.

(19) On July 21, 1908, the corporation, through its board of directors, sold to J. S. Harrison, E. Nelson, and J. L. Enright each $1,000 of stock at 75 cents on the dollar.

(20) The minutes of the corporation show that at a meeting held June 3, 1911, there were present, representing stock in said corporation, as follows: Oscar Myre, 50 shares; E. Nelson, 50 shares; Mrs. A. L. Elliott, 20 shares; R. G. Ard, 15 shares; Mrs. Droke, 21 shares; and J. S. Harrison, 80 shares—total 236 shares. Mrs. Droke's shares had been further reduced from 31 to 21 shares by her surrendering 10 shares in payment of a debt she owed to the corporation. At this meeting the ten shares owned by Mrs. Kessler were surrendered and canceled in payment of a debt for $1,000, due by her to the corporation.

(21) On January 10, 1911, J. L. Enright sold his certificate for 10 shares to J. S. Harrison.

(22) July 9, 1911, J. S. Harrison, for the consideration of $5,000, sold to E. Nelson his certificate for 50 shares of stock, dated May 29, 1907; his certificate for 10 shares of stock dated July 22, 1908, purchased by him from J. L. Enright, and 10 additional shares.

(23) At each of the times of the respective sales of stock of the corporation, after the issuance of the first 150 shares of stock to the members of the firm of T. H. Kessler & Co., the corporation was a going concern and was perhaps solvent; but it needed money to operate its business and to pay debts incurred in such operation, and was unable to continue its business without such money, and had no means of obtaining such money, except by the sale of its stock, or by mortgaging its property. Each of said sales was made for the full market price of such stock, and for the highest price that could be obtained for such stock, and no stock was at any time sold in excess of the then needs of the corporation to enable it to carry on its business. Each of said sales was beneficial to the corporation, its stockholders, and to its then creditors. All of the money obtained from such sales was used in the prosecution of the business of the corporation, and for no other purpose, and none of the money realized from such sales of stock was used for additional investments by the corporation.

(24) None of the certificates purchased by E. Nelson were ever transferred to him on the books of the corporation by surrendering the said certificates and obtaining new certificates in lieu thereof, but the said purchases were known to the corporation, and he was elected a member of its board of directors, and on June 19, 1911, he was elected president and general manager of the corporation, and continued as such until the corporation went into bankruptcy October 15, 1912.

(25) The salary of E. Nelson, as president and general manager of the corporation, was never fixed by the board of directors, but he caused to be credited to himself, on the books of the corporation, for such services, the sum of $200 per month from July 1, 1911, to June 1, 1912, and from June 1, 1912, to October 15, 1912, the sum of $150 per month, aggregating for such salary $2,875, and his services were reasonably worth that amount. He received during said time in cash and merchandise, and caused to be charged against himself on the books, $2,972.88. He was not otherwise paid anything for such services.

(26) From and after the 1st day of January, 1912, said corporation was heavily involved, and its creditors were insistent and pressing, and there was constant demand for money for the purpose of liquidating indebtedness, and for the purpose of paying for material ordered by said company for the purpose of carrying on its work, which said material was required to be paid for in cash, and for the purpose of paying the laborers for carrying on the work of said corporation, which was required to be paid for in cash weekly, and the corporation, from time to time, being without sufficient money to meet said obligations, the said E. Nelson voluntarily paid into and for said corporation for said purposes the sum of $3,857.49 in cash.

(27) Said payments made by said E. Nelson in said sum as aforesaid, into and for said corporation, were made by him without any contract for the repayment of the same, and were made by him on his own responsibility and in recognition of the needs of

said corporation, and at the time of the payment of the same and all the same, except the sum of $252.92 paid the Owens Lumber Company on the 15th day of October, 1912, said corporation was a going concern, actively engaged in operation and the carrying out of the purposes for which it was chartered and organized, and said Nelson at the time believed the same to be solvent, and made said payments and advancements to said corporation in good faith, believing that the same would enable said corporation to tide over temporary embarrassments, and continue indefinitely a solvent and going concern.

(28) That said sum of $252.92 paid to said Owens Lumber Company on said 15th of October, 1912, was made by him because he had long prior thereto personally obligated himself to pay the same, or to see the same paid, and at the time he so obligated himself he did so in good faith, believing said corporation was solvent.

(29) On or about the 17th day of October, 1912, the corporation of T. H. Kessler & Co. went into voluntary bankruptcy, and the proceeds of the sale of its properties has proved insufficient to discharge its indebtedness, and there remains undischarged approximately $10,000 of indebtedness owed by said corporation.

(30) The referee in bankruptcy, by order duly made, directed the trustee to bring these suits for the several amounts claimed herein.

(31) The defendant E. Nelson proved up a claim in the bankruptcy proceedings against the estate of T. H. Kessler & Co., bankrupt, for the sum of $3,672.65, based on such moneys so advanced by him to and for said corporation. Such proof was made upon the advice of counsel, in view of the situation as it then existed, and was not in contemplation at the time such advancements were made, and nothing whatever has been paid on said claim, and nothing will or can be paid thereon, unless a recovery be had in these causes, and such payment would have to be made out of such recovery.

Appellant, as trustee for the bankrupt corporation of T. H. Kessler & Co., brought two suits to recover an alleged balance due for stock in said corporation, one against J. M. Nelson et al. and one against J. S. Harrison et al. The suits were consolidated. Upon trial before the court without a jury, judgment was rendered for the defendants. The above findings of fact are substantially those found by the trial court. The appellant prosecutes his appeal on 62 assignments of error. In view of the disposition that we make of the case, we do not deem it necessary to discuss seriatum all of the matters presented in the findings of fact and in appellant's assignments of error.

## Opinion.

[1, 2] It is well settled, as a general proposition, that the capital stock of a corporation is a trust fund for the benefit of creditors, and creditors may enforce the payment thereof in full as against the subscribers for such stock, and against their transferees with knowledge that such stock has not been fully paid for. Mathis v. Pridham, 1 Tex. Civ. App. 58, 20 S. W. 1023; Nenney v. Waddill, 6 Tex. Civ. App. 244, 25 S. W. 308; Sawyer v. Hoag, 84 U. S. (17 Wall.) 610, 21 L. Ed. 731; Sanger v. Upton, 91 U. S. 56, 23 L. Ed. 221; Scovill v. Thayer, 105 U. S. 143, 26 L. Ed. 968; Chubb v. Upton, 95 U. S. 665, 24 L. Ed. 523; Hawley v. Upton, 102 U. S. 314, 26 L. Ed. 179; Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203; Webster v. Upton, 91 U. S. 65, 23 L. Ed. 384; Land Co. v. Raymond, 158 N. Y. 576, 53 N. E. 507, 47 L. R. A. 246. Nothing said in this opinion is intended to impinge upon this doctrine when applied to a proper state of facts. It has been said that this doctrine was invented by Mr. Justice Storey, and is slowly becoming obsolete. 10 Cyc. 461. It is not obsolete in Texas, and will not become obsolete anywhere until honesty shall become obsolete. It may be true in these days of frenzied finance and watered stock that professional dealers base their estimates as to the value of stocks upon the assets and liabilities of the corporations, when they find out what they are, but the investing public is daily robbed through the medium of watered stock, which is the life blood of gambling on exchanges. The Constitutions of many of the states, including our own, have provisions that are designed to prevent the issuance of watered stock, and this is effectually accomplished by our present corporation laws. But, at the time the corporation in the instant case was chartered, our statute only required that 50 per cent. of the capital stock be subscribed, and that 10 per cent. be paid up. R. S. 1895, art. 654. This amount was subscribed and fully paid up, whether the property conveyed to the corporation was worth $30,000, as found by the trial court, or $15,000, as contended by appellant.

In considering the cases wherein it has been held that unpaid subscriptions to capital stock is a trust fund for the benefit of creditors, it must be kept in mind that there is a distinction between stock subscribed for the purpose of organizing the corporation and stock sold by an organized corporation for the purpose of enabling it to pay its debts or to carry on its business. In the former case it is held upon equitable grounds that the subscription is a contract to pay the full par value of the stock, if it becomes necessary to do so in order to protect creditors; in the latter case the purchase is a contract to pay only the price agreed upon, if the same be the fair market price of the stock purchased. Handley v. Stuz, 139 U. S. 417, 11 Sup. Ct. 530, 35 L. Ed. 227; Clark v. Bever, 139 U. S. 96, 11 Sup. Ct. 468, 35 L. Ed. 88; Fogg v. Blair, 139 U. S. 118, 11 Sup. Ct. 476, 35 L. Ed. 104; Christenson v. Eno, 106 N. Y. 97, 12 N.

E. 648, 60 Am. Rep. 429; Christenson v. Quintand, 8 N. Y. Supp. 400[1]; Morrow v. Iron & Steel Co., 87 Tenn. 275, 276, 10 S. W. 500, 3 L. R. A. 37, 10 Am. St. Rep. 658; Morowitz on Corporations, § 306; Cook on Corporations, §§ 22, 42, and 45.

In Christenson v. Eno, supra, wherein it was sought to recover of defendant 40 per cent. of the par value of the stock given him as a bonus in the purchase of the stock and certain bonds of an organized and going corporation, after recognizing the doctrine that the subscribed stock of a corporation is a trust fund for the benefit of creditors, the court said:

"Strictly the capital stock of a corporation is the money contributed by the corporators to the capital, and is usually represented by shares issued to the stockholders on the initiation of the corporate enterprise. * * * There is no pretense that Eno ever subscribed for the 25 shares of bonus stock, so called."

In the instant case, the purchasers of stock sold for the purpose of enabling the corporation to continue its business, and not for the purpose of increasing its investment, or enlarging its plant, were not subscribers to its stock, in the sense that subscribers are required to pay the full par value of their stock.

The court in Morrow v. I. & S. Co., supra, after announcing in strong terms the doctrine that the capital stock of a corporation is a trust fund for the benefit of creditors, said:

"What we have said as to the construction and legal effect of the subscription involved in this case is not intended to apply to sales of, or subscriptions to, the stock of an organized and going corporation. * * * The necessities of the business of an organized company might demand an increase of capital stock, and, if such stock is lawfully issued, it may very well be offered upon special terms. * * * In such case, all questions of fraud aside, the purchaser would only be held for his contract price."

In the instant case the necessities of business demanded, not an increase of the capital stock, but an increased issuance of capital stock, and the directors were authorized by the statute to sell the same. R. S. 1895, art. 661.

"The wholesome doctrine, so many times enforced by this court, that the capital stock of an insolvent corporation is a trust fund for the payment of its debts rests upon the idea that the creditors have a right to rely upon the fact that the subscribers to such stock have put into the treasury of the corporation, in some form, the amount represented by it; but it does not follow that every creditor has a right to trace each share of stock issued by such corporation, and inquire whether its holder, or the person of whom he purchased, has paid its par value for it. It frequently happens that corporations, as well as individuals, find it necessary to increase their capital in order to raise money to prosecute their business successfully, and one of the most frequent methods resorted to is that of issuing new shares of stock and putting them upon the market for the best price that can be obtained; and so long as the transaction is bona fide, and not

a mere cover for 'watering' the stock, and the consideration obtained represents the actual value of such stock, the courts have shown no disposition to disturb it." Handley v. Stutz, supra.

For the reasons above stated, we think the judgment of the trial court should be affirmed.

[3] We think the judgment of the trial court was correct as to E. Nelson for another reason. If it should be held that he was liable for the difference between the par value of the stock held by him and the price for which the corporation sold the same, we think that it ought to be held that he paid the same with the money advanced by him for conducting the business, as set forth in finding of fact No. 26, supra.

It is the contention of appellant that E. Nelson is not entitled to a credit for the money so advanced by him, even to the extent of making him a creditor of the corporation, for the reason that he was a volunteer in the transaction. He was the principal stockholder in the corporation, its president and general manager, and as such was intrusted with the conduct of its business; it was necessary that the corporation should have money to pay for labor and material; he advanced the money needed for these purposes; the corporation knew that such advancements were being made, and accepted the benefit of the same. We do not think, under these circumstances, that Nelson should be held to be a volunteer in the sense that he would not have been entitled to repayment of the money advanced had the corporation continued in business, if no set-off against him was shown.

Such being the case, we are of the opinion that should it be held that if Nelson, at the time that such advancements were made, was indebted to the corporation for stock held by him, the advancements should be applied to the payment of his indebtedness. There can be no doubt that this would be so had he at the time such advancements were made, or prior thereto, made a contract with the corporation to that effect. He made no such contract; neither did he ever contract to pay the difference between the par value of his stock and the price for which the same was sold. Such liability is purely a doctrine of equity invented by the courts to prevent fraud being practiced upon creditors. But this doctrine ought not to be carried to the extent of working a fraud upon one who in good faith has advanced money to the corporation, not only for the benefit of the corporation, but also for the benefit of creditors. Had the creditors been consulted at the time, no doubt they would have consented to such advancements being made and applied upon Nelson's debt, if any he owed, for the balance due on his stock. Indeed, the money advanced by Nelson, except that which was paid for labor to keep the business going, was paid to creditors for material used in the conduct of the business. Under these circum-

---

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 55 Hun, 608.

stances, we think that the same equitable power of the court that enables it to compel the payment of a debt, which the purchaser of stock never in fact contracted to pay, is sufficient to enable the court to apply to the payment of such debt money advanced to the corporation which was necessary to the conduct of its business.

[4] For still another reason we think that the judgment of the trial court was right as to a portion of the stock sold below par.

On May 29, 1907, Mrs. Kessler was indebted to the corporation in the sum of $3,164.73. On that day, by agreement with the board of directors, she surrendered 31 shares of her stock in payment of her indebtedness. This stock was fully paid up, and, if it was legally acquired by the corporation, it had the right to resell the same at any price, fraud aside, that it saw proper. A corporation may take its own stock in payment of debts owing it, and may hold and sell the stock thus acquired. 10 Cyc. 713; City Bank v. Bruce, 17 N. Y. 507; Bank v. Hunt, 7 Mo. App. 42; Ex parte Holmes, 5 Cow. (N. Y.) 426; Barto v. Nix, 15 Wash. 563, 46 Pac. 1033. On the same day that the corporation purchased the 31 shares of stock from Mrs. Kessler, it sold 50 shares to J. S. Harrison. The minutes do not show that the shares acquired from Mrs. Kessler were sold to Harrison, but as the corporation had the right to sell the shares acquired from Mrs. Kessler, if it did not have the right to sell any other shares, it will be presumed, in the absence of evidence to the contrary, that it sold those that it had the legal right to sell.

On March 24, 1903, the corporation purchased from Mrs. Kessler 9 additional shares in payment of a debt owing by her, and from Mrs. Droke 5 shares, in payment of a debt owing by her. On July 21, 1908, the corporation purchased from A. L. Elliott, in payment of the note owing by him, 30 shares, and on the same day sold 30 shares, as follows: 10 shares to Harrison, 10 shares to E. Nelson, and 10 shares to Enright. It thus appears that, of 80 shares above mentioned, the corporation had the legal right to sell all of them, except 19 of the shares sold to Harrison on May 29, 1907.

Believing that the trial court rendered the proper judgment herein, the same is affirmed.

Affirmed.

### Additional Findings of Fact.

The trial court, among other things, found that the property transferred by the copartnership T. H. Kessler & Co. to the corporation T. H. Kessler & Co. was of the value of $30,000; that 150 shares of the corporation stock was issued to the owners of the partnership property in proportion to their interest therein; and that the remaining 150 shares were treated by the corporation as treasury stock. As we cannot say that these findings of fact were not supported by the evidence, we adopt them as our own.

At the request of appellant, we also make the additional finding of fact: At the time E. Nelson made the advancements to the corporation as set out in the opinion herein, he did not know or believe that he owed anything on his stock, and did not intend that such advancements should be credited on any indebtedness for unpaid balance on stock in the corporation owing by him.